296 F.3d 799
 Gregory LAWSON, Plaintiff-Appellant,
v.
State of WASHINGTON; The Washington State Patrol; Annette M. Sandberg, in her official capacity and individual capacity; Lowell M. Porter, in his official and individual capacity, Defendants-Appellees.
 No. 00-35458.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted November 7, 2001.
 Filed July 12, 2002.
 
 COPYRIGHT MATERIAL OMITTED Hugh J. McGavick, Law Office of Hugh J. McGavick, Olympia, Washington, for the plaintiff-appellant.
 Carol A. Smith-Merkulov, Senior Counsel, Office of the Attorney General, Olympia, Washington, for the defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington; Franklin D. Burgess, District Judge, Presiding. D.C. No. CV-99-5419-FDB.
 Before: REAVLEY,* B. FLETCHER, and TALLMAN, Circuit Judges.
 Opinion by Judge TALLMAN; Dissent by Judge BETTY B. FLETCHER.
 OPINION
 TALLMAN, Circuit Judge.
 
 
 1
 This civil rights case turns upon whether Gregory Lawson was constructively discharged from his employment as a cadet in the Washington State Patrol Academy's 82nd Trooper Basic Training Class. Lawson brought this action against the State of Washington, the Washington State Patrol, Chief Annette Sandberg, and Captain Lowell Porter (collectively "WSP"), pursuant to Title VII, 42 U.S.C. § 1983, and Revised Code of Washington 49.60, alleging religious discrimination and failure to accommodate.[1] The district court granted the WSP's motion for summary judgment on all claims. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.
 
 
 2
 * We discuss the relevant facts in the light most favorable to Lawson, as we must when considering an adverse summary judgment. See Draper v. Coeur Rochester, 147 F.3d 1104, 1105 (9th Cir.1998).
 
 
 3
 Lawson was hired by the WSP in 1998. His basic training as a trooper cadet commenced at the WSP Academy in Shelton, Washington, on July 13, 1998. Lawson was issued a manual entitled Procedures, Rules and Regulations: 82nd Trooper Basic Training Class ("Manual") as part of his police academy training. The Manual states that "[a]ll cadets will assemble for flag formations [twice daily] unless otherwise assigned." The Manual states that if a cadet deviates from the rules he will be subject to discipline up to and including termination. For the first two days at the Academy, Lawson fully participated in flag formations and performed the required hand salutes.
 
 
 4
 Lawson says it was troubling for him to perform this duty because he is a Jehovah's Witness. He asserts that because of his religious beliefs he may not salute the flag of any state or nation. During the same two-day period Lawson also read a copy of the Trooper's Oath ("Oath"),[2] to be taken upon successful completion of his Academy training. As a Jehovah's Witness, Lawson says he may only swear allegiance to his faith and to God. Lawson had twice previously applied for this position and had completed a written personal history and background questionnaire in which he had certified as true his affirmative answer to the question, "Are you willing to take an oath to support the Constitution of the United States and the Constitution of the State of Washington?"
 
 
 5
 Nonetheless, on the evening of his second day of training, July 14, 1998, Lawson sought out one of his Trooper Advisor Counselors ("TAC") at the Academy, Lenny Walker, to announce that he had decided to resign because of a conflict between his religious beliefs and his employment requirements. The Manual directs cadets to contact their TACs if they encounter personal problems. Walker asked Lawson to explain the problem. Lawson replied "that although it was the last thing that [he] wanted to do, [he] felt [he] had no choice but to resign from the academy." He informed TAC Walker that he could not salute the flag or take an oath of allegiance to a government because of his religious beliefs. Lawson then asked TAC Walker if there was something he could do besides salute the flag. Lawson suggested possible accommodations such as standing respectfully during formation or performing cleaning duties elsewhere. Walker replied that he did not know of anything that could be done. He then asked Lawson if he still wished to resign. Thinking that he had no alternative, and that he would be fired for insubordination and humiliated if he did not comply with his employment requirements, Lawson confirmed his decision to resign.
 
 
 6
 The following day Lawson met with Lieutenant Kenneth J. Irwin, Acting Commander of the WSP Academy, and informed him that his religious beliefs prevented him from saluting the flag and taking the Oath. Lieutenant Irwin did not discuss possible accommodations. Instead, he presented Lawson with a resignation letter, already prepared by the WSP, stating that he was resigning for personal reasons. Lawson says he signed the resignation letter because he believed the Academy would not make any exceptions to the rules on his behalf.
 
 
 7
 The same day Lawson participated in an exit interview conducted by Sergeant D. Devoe during which he completed an exit questionnaire. The questionnaire stated that the principle reason Lawson left the Academy was because of his religious beliefs. Specifically he stated:
 
 
 8
 As one of Jehovah's Witnesses [sic], it goes against my beliefs to salute any flag, or pledge allegiance to any country or state. This makes it impossible for me to give the oath to be a Trooper. My time away is also hard on my family.
 
 
 9
 Lawson suggested on the questionnaire that the WSP "make allowances for those with religious differences...." No possible accommodations were discussed during the exit interview.
 
 
 10
 After Lawson's resignation was accepted, he contacted Captain Lowell Porter, Commander of the WSP Human Resources Division, to request information regarding the WSP's official policy on religious accommodations. Lawson again explained the reason for his resignation. Captain Porter stated that the WSP would not offer him any accommodations and that if he wished to be a Washington State Trooper he would have to salute the flag and swear his allegiance by taking the Oath. Because Captain Porter refused to discuss any accommodations, Lawson tried to reach Chief Annette Sandberg. Chief Sandberg did not return his call.
 
 
 11
 Lawson subsequently filed a complaint with the Washington State Human Rights Commission and the EEOC.[3] He then filed his federal civil rights complaint alleging federal and state claims. The district court granted the WSP's motion for summary judgment on all claims. Lawson's appeal followed.
 
 II
 
 12
 We review de novo a district court's decision to grant summary judgment. See Balint v. Carson City, 180 F.3d 1047, 1050 (9th Cir.1999). Such review is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56(c). See Far Out Prods. v. Oskar, 247 F.3d 986, 992 (9th Cir.2001). We must therefore determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact, and whether the district court properly applied the relevant substantive law. See Balint, 180 F.3d at 1054.
 
 III
 
 13
 Title VII makes it unlawful for an employer to discharge an employee because of the employee's religion.[4] 42 U.S.C. § 2000e-2(a)(1). It is therefore an "unlawful employment practice ... for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees...." Trans World Airlines v. Hardison, 432 U.S. 63, 74, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977).
 
 
 14
 Title VII religious accommodation claims are analyzed under a two-part framework. Under the first part, Lawson must establish a prima facie case by showing that: (1) he had a bona fide religious belief, the practice of which conflicted with his employment duties as a WSP trooper cadet; (2) he informed the WSP of his beliefs and the conflict; and (3) the WSP "threatened him with or subjected him to discriminatory treatment, including discharge, because of his inability to fulfill the job requirements." Heller v. EBB Auto Co., 8 F.3d 1433, 1438 (9th Cir.1993). See also Tiano v. Dillard Dep't Stores, 139 F.3d 679, 681 (9th Cir.1998). Once an employee establishes a prima facie case, the burden of proof then shifts to the employer under the second part of the framework to "establish that it initiated good faith efforts to accommodate the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." Heller, 8 F.3d at 1438.
 
 
 15
 It is undisputed in this case that as a Jehovah's Witness, Lawson's bona fide religious beliefs conflict with the WSP requirements that he salute the flag and undertake the obligation of a commissioned law enforcement officer before he assumes his office to swear his allegiance to the United States and the State of Washington. See W.Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 643, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (Black & Douglas, JJ., concurring) (finding "[t]he Jehovah's Witnesses, without any desire to show disrespect for either the flag or the country, interpret the Bible as commanding, at the risk of God's displeasure, that they not go through the form of a pledge of allegiance to any flag").
 
 
 16
 It is also undisputed that Lawson informed his employer of the conflicts between his religious beliefs and his employment duties. Pursuant to Heller, an employee need only inform his employer about his religious needs for the employer to understand the conflict between the employer's expectations and the employee's religious practices. 8 F.3d at 1439; Brown v. Polk County, 61 F.3d 650, 654 (8th Cir.1995) (rejecting an employer's claim that an employee may not assert Title VII protections because the employee did not explicitly ask for a religious accommodation) (citing Heller, 8 F.3d at 1439). According to Lawson, he notified TAC Walker and Lt. Irwin of the conflict before he signed the resignation papers, and discussed possible accommodations with TAC Walker.
 
 
 17
 The district court ruled as a matter of law, however, that Lawson did not establish sufficient evidence to meet the third prong of the Heller test. Lawson asserts that he satisfies the third prong because he was constructively discharged. Lawson contends that once he discovered he was unable to perform his employment duties due to his religious beliefs, he felt he had no option but to resign because to do otherwise would violate the Academy's rules.[5] The district court found that Lawson did not present any facts that created an issue of constructive discharge, since the evidence shows that Lawson informed Walker during the first meeting of his decision to voluntarily resign. We agree.
 
 
 18
 "A constructive discharge occurs when a person quits his job under circumstances in which a reasonable person would feel that the conditions of employment have become intolerable." Draper, 147 F.3d at 1110 (emphasis added). Thus, an employee need not demonstrate that his employer intended to force him to resign, but merely that his conditions of employment were objectively intolerable. Id. Summary judgment is therefore appropriate on a constructive discharge claim where the "decision to resign [was] unreasonable as a matter of law." King v. AC & R Advertising, 65 F.3d 764, 767 (9th Cir.1995).
 
 
 19
 Cadets voluntarily quit the Academy for a variety of personal reasons throughout the rigorous six-month training regimen. Indeed, Lawson offered as one of his reasons for wanting to resign the fact that he was forced to be away from his family more than he wished. That the Academy staff did not make extraordinary efforts to talk him out of leaving does not give rise to a legal conclusion that he was constructively discharged. According to the uncontradicted affidavits on summary judgment, it was Lawson who first mentioned resignation to his counselor. Further, no one mentioned anything about imposing discipline on him for refusing to comply.[6]
 
 
 20
 We do not believe that a jury could find on these facts that a reasonable person in his position would have felt compelled to resign at this stage of the matter. The mere fact that the Manual declares that rule violations may result in discipline or termination is not enough. Lawson's realization that his religious beliefs fundamentally conflicted with his employment duties led him to contact TAC Walker. The State argues that trainees often drop out of the Academy based upon a variety of factors. We see no reason why, as part of the screening and training process, the Academy staff must try to talk every recruit out of resigning once an individual announces that he wants to leave.
 
 
 21
 Lawson says he next discussed his decision with several higher ranking WSP officers, none of whom suggested an accommodation. After his resignation, in an attempt to understand the WSP policy, Lawson spoke with Captain Porter, who would not offer him any alternatives or accommodations that might permit reinstatement.[7] Given our conclusion rejecting this argument, there was no further obligation on the part of the employer to offer or discuss such accommodations.
 
 
 22
 We therefore hold that there is not sufficient evidence to create a material issue of fact as to whether Lawson was constructively discharged. We affirm the district court's order granting summary judgment on Lawson's Title VII claim.
 
 IV
 
 23
 Lawson also contends the district court erred in granting summary judgment on his § 1983 claim. In considering the interaction between Title VII and § 1983, the Eighth Circuit has held that "if a governmental employer has violated Title VII, it has also violated the guarantees of the first amendment." Brown, 61 F.3d at 654. Relying upon Brown, the district court concluded that because there was no Title VII violation, there were no facts to support Lawson's § 1983 claim. Because we find that Lawson cannot establish a prima facie case of religious discrimination under Title VII, we hold that the district court did not err in dismissing Lawson's § 1983 claim on this basis.
 
 
 24
 In addition, Lawson alleged an independent § 1983 violation based upon Captain Porter's remarks after he resigned. The district court found this claim un-substantiated. The district court was correct. Lawson provides no support for the assertion that his right to freely exercise his religion was violated after he voluntarily resigned from the WSP's employ.[8] The judgment dismissing this claim against Captain Porter is also affirmed.
 
 
 25
 AFFIRMED.
 
 
 
 Notes:
 
 
 *
 Honorable Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 Lawson does not appeal the district court's dismissal of his state law claims
 
 
 [2]
 The Oath of Office of a commissioned Washington State Trooper, administered upon successful completion of basic police academy training, requires each new State law enforcement officer to raise his/her right hand and repeat the following:
 I (state your name), do solemnly swear that I will bear true faith and allegiance to the United States of America and the State of Washington, and that I will serve them honestly and faithfully, and that I will obey the orders of the Governor and the State of Washington and the officers appointed over me, according to law and the rules and regulations of the State Patrol and that I will uphold the Constitution of the United States and the State of Washington.
 
 
 [3]
 The timing of these filings is not at issue in this action
 
 
 [4]
 Religion includes:
 all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.
 42 U.S.C. § 2000e(j).
 
 
 [5]
 The WSP implicitly argues that Lawson's attendance at two flag formation practices prior to notifying TAC Walker of his religious conflict bears some relevance. But we do not think that an employee who temporarily gives up his religious practice to submit to employment requirements waives his discrimination claimSee EEOC v. Townley Engineering & Mfg. Co., 859 F.2d 610, 614 n. 5 (9th Cir.1988) ("An employee does not cease to be discriminated against because he temporarily gives up his religious practice and submits to the employment policy."). Similarly, "[t]he prima facie case does not include a showing that the employee made any efforts to compromise his or her religious beliefs or practices before seeking an accommodation from the employer." Heller, 8 F.3d at 1438.
 
 
 [6]
 Contrary to the dissent's position, there is no evidence that Lawson was threatened with termination or discipline because of his inability to salute the flag and take the oath of office
 
 
 [7]
 Lawson claims that the district court erred in finding that the WSP and Captain Porter did not have a continuing duty to offer reasonable accommodation and refrain from discrimination after he resigned from his position, and that he had no legal right to immediate reinstatement. Lawson appears to make this argument in support of his constructive discharge claim. The district court properly found Captain Porter's statements to Lawson were irrelevant as Lawson had already resigned and Captain Porter no longer had any legal obligation towards him. On appeal, Lawson fails to present any legal authority in support of his contentions. This argument fails as a matter of law as we are aware of no such authority creating a continuing duty to accommodate after resignation when there was no constructive discharge
 
 
 [8]
 Similarly, the dissent is unable to cite any authority in support of its position that Captain Porter's response was a continuation of the WSP's discrimination against Lawson
 
 
 BETTY B. FLETCHER, Circuit Judge, dissenting:
 
 26
 The majority affirms the summary judgment dismissal of Lawson's Title VII and § 1983 claims, concluding that Lawson was not constructively discharged by the Washington State Patrol ("WSP"). I respectfully dissent. The majority couches Lawson's struggle with the WSP as a simple voluntary resignation and not a constructive discharge. But this is a case about the fundamental right to religious freedom. It is the story of a conscientious young man who aspires to a career in law enforcement; a young man who also is profoundly religious. His religion does not allow him to swear under oath or salute the flag. He is committed to rendering public service in law enforcement. The only barrier to service in the state patrol is the WSP's failure to accommodate his religion.
 
 I.
 Title VII Claim
 
 27
 Title VII makes it unlawful for an employer to discharge or otherwise discriminate against an employee in employment matters because of the employee's religion. 42 U.S.C. § 2000e-2(a)(1). For summary judgment purposes, Lawson established a prima facie case of religious discrimination. The majority concedes that Lawson satisfied the first two elements of the prima facie case: (1) Lawson had a bona fide religious belief, the practice of which conflicted with his employment duties as a WSP trooper cadet, and (2) he informed the WSP of his religious beliefs and the conflict. See Heller v. EBB Auto Co., 8 F.3d 1433, 1438 (9th Cir.1993). Lawson also established the third and final element: he raised a genuine issue of fact as to whether the WSP "threatened him with... discriminatory treatment ... because of his inability to fulfill the job requirements." Id. at 1438. The WSP manual, uncontradicted by Lawson's supervisors, provided Lawson a compelling threat of either discipline or discharge. "The employee need not be penalized with discharge to establish a prima facie case." Opuku-Boateng v. State of California, 95 F.3d 1461, 1467 n. 9 (9th Cir.1996).
 
 
 28
 As the majority notes, the test for a constructive discharge is objective — the conditions of employment must have become so intolerable as to cause a reasonable person to quit. Draper v. Coeur Rochester, Inc., 147 F.3d 1104, 1110 n. 2 (9th Cir.1998). "[C]onstructive discharge does not follow automatically from the employer's conduct as a whole, or from any particular, identifiable fact. It requires in each case an exercise of independent judgment on the part of the employee." Id. at 1110. Thus, the determination of whether the conditions were so intolerable as to justify a reasonable employee's decision to resign is typically a factual question left to the trier of fact. Watson v. Nationwide Ins. Co., 823 F.2d 360, 361 (9th Cir.1987).
 
 
 29
 Viewing the evidence in the light most favorable to Lawson, a reasonable trier of fact could find that a reasonable person in Lawson's position would have felt compelled to resign. After reading his basic training manual, Lawson understood that rule violations resulted in discipline or termination. He quickly recognized that failing to salute the flag and swear faith and allegiance to the United States and the State of Washington violated the rules of the WSP Academy; he found no exceptions listed in the manual. Realizing that his religious beliefs conflicted with the demands of his employment, Lawson turned to Lenny Walker, the Teacher Advisor Counselor whom he was encouraged to contact if he encountered personal problems.
 
 
 30
 According to Lawson's declaration, Lawson informed Walker that his religious beliefs conflicted with the requirements that he salute the flag and swear allegiance under oath. He insisted that he did not wish to resign but felt he had no other option if he were required to salute the flag and swear allegiance under oath. Walker questioned him about his religious beliefs. Lawson asked if there were something he could do besides saluting the flag; he suggested that he be allowed to stand respectfully without saluting during the flag ceremony or to take on cleaning duties during the ceremony period. Walker said he did not know of any accommodation that could be made. He then asked if Lawson wanted to resign.
 
 
 31
 Since Walker had indicated that Lawson would not be excused from saluting or swearing allegiance, Lawson reasonably expected that discipline or termination for insubordination would follow if he failed to comply. As Lawson notes in his declaration, termination for insubordination would have jeopardized his opportunities for future employment in law enforcement. Lawson was also concerned that refusing an order to salute the flag would cause a humiliating public spectacle in front of his peers and superiors. Walker did nothing to allay these fears, but rather confirmed Lawson's initial impression, based on the training manual, that the WSP would require him to compromise his religious beliefs if he wished to continue his employment. Understandably, Lawson informed Walker that he saw no alternative but to resign. See Young v. Southwestern Sav. & Loan Ass'n, 509 F.2d 140, 144 (5th Cir.1975) (holding that an employee could reasonably infer that she would eventually be discharged for failing to attend company meetings).
 
 
 32
 The next day Lawson discussed his conflict with other WSP officers. Lawson informed Lieutenant Kenneth J. Irwin that he could not salute the flag or take the oath of office as written due to his religious beliefs. Without discussing any possible accommodations, Lieutenant Irwin presented Lawson with an already prepared resignation letter stating that he was resigning for personal reasons. Lawson signed the letter believing that the WSP would make no exceptions to the rules to accommodate his religious beliefs.
 
 
 33
 As the majority acknowledges, Lawson stated on his exit questionnaire that the conflict with his religious beliefs was his principal reason for leaving the WSP Academy. Lawson even suggested on the questionnaire that the WSP "make allowances for those with religious differences," yet during the exit interview Sergeant Devo offered no accommodation. After his resignation, Lawson spoke with Captain Porter who informed Lawson that the WSP would offer him no alternatives or accommodations. Captain Porter's response was consistent with the responses Lawson received from other staff members prior to his resignation.
 
 
 34
 According to the majority, the WSP's staff was not required to talk Lawson out of resigning just because he "announc[ed] that he want[ed] to leave." Majority op. at 805. However, Lawson did not announce that he wanted to leave. Rather he informed his advisors and superiors that he believed he had no choice but to resign because his religious beliefs prevented him from complying with all of the rules in the manual, and he sought accommodation. He specifically stated that resigning was "the last thing he wanted to do." In response, they offered him no hope that exceptions to the rules could be made or that discipline or discharge could be avoided. Lawson resigned only after his requests for accommodation were refused.
 
 
 35
 The majority would require Lawson to risk being fired for insubordination, which would ruin his chances of obtaining law enforcement work with more tolerant employers. The majority would have him take such a substantial risk and suffer humiliation in order to put to the test the WSP's representatives' statements with regard to its policies. This is not the law. An employee need not bear "the considerable emotional discomfort of waiting to be fired instead of immediately terminating" his employment. See Young, 509 F.2d at 144. The doctrine of constructive discharge applies precisely to this situation — an employee "involuntarily" resigns when he sees no alternative other than the intolerable employment requirements.
 
 
 36
 The WSP was not obligated to "make extraordinary efforts to talk [Lawson] out of leaving," Majority op. at 805, but it was legally required to make a reasonable effort to accommodate Lawson's religious beliefs. Title VII places an affirmative duty on an employer reasonably to accommodate the religious observances and practices of its employees, unless it can establish that accommodation would cause undue hardship to its business. Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 63 n. 1, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986); E.E.O.C. v. Ilona of Hungary, Inc., 108 F.3d 1569, 1574-75 (7th Cir.1997). It is the employer's burden to attempt an accommodation or to prove undue hardship. Heller, 8 F.3d at 1439-40; E.E.O.C. v. Townley Eng'g & Mfg., Co., 859 F.2d 610, 615 (9th Cir.1988) (stating that the burden of attempting an accommodation lies with the employer, not the employee); Opuku-Boateng, 95 F.3d at 1467; Ilona of Hungary, 108 F.3d at 1575(stating that it is the employer's burden to prove undue hardship). It is undisputed that the WSP made no efforts to accommodate Lawson.
 
 
 37
 The WSP also concedes that, if Lawson had requested an accommodation for his religious beliefs, "accommodations could have been made, including allowing Lawson to`affirm' rather than `swear' and having him stand at attention and not salute during flag detail." This admission is supported by the affidavit of Lieutenant Irwin who believed that these accommodations were reasonable and could have been made for Lawson. The WSP recognizes the obvious: there is no undue hardship in allowing Lawson to affirm rather than swear. Such an allowance is common in other settings. Trial witnesses may take an oath or simply affirm that they will testify truthfully; they need not swear to tell the truth. Fed.R.Evid. 603 advisory committee's note ("[Rule 603] is designed to afford the flexibility required in dealing with religious adults, atheists, conscientious objectors, mental defectives, and children. Affirmation is simply a solemn undertaking to tell the truth."). More directly on point, lawyers taking the oath of attorney for admission to bars are permitted to declare or affirm, as an alternative to swearing, that they will support the constitution and laws of the nation and the relevant jurisdiction. See, e.g., S.Ct. Application for Admission to Practice (using the words "swear" or "affirm"); Wash. State Bar Admission to Practice R. 5(b) (using the word "declare"); W.D. Wash. Gen. R. 2(c)(3)(using the words "swear" or "affirm"). The oath of office for federal justices and judges also is administered with flexibility to accommodate those with religious objections to swearing; judges may affirm, rather than swear, that they will perform their duties faithfully and impartially. See 28 U.S.C. § 453. Much like law enforcement officials, we rely on judges and lawyers to uphold the law through their work, but we are satisfied that they are serious about doing so when they affirm or declare their commitment as an alternative to swearing.
 
 
 38
 For summary judgment purposes, Lawson has established a prima facie case of religious discrimination. Contrary to the majority, he has raised a genuine issue of fact as to whether the WSP constructively discharged him. The WSP did not attempt an accommodation and now concedes that accommodation would impose no undue hardship. As a result, the district court erred in granting the WSP's summary judgment motion as to Lawson's Title VII claim.
 
 II.
 
 39
 § 1983 Claims
 
 
 40
 Relying on Brown v. Polk County, 61 F.3d 650 (8th Cir.1995), the district court concluded that, because there was no Title VII violation, there were no facts to support Lawson's § 1983 claim. Because I would find that Lawson's Title VII claim of religious discrimination survives summary judgment, I would also reverse the district court's dismissal of Lawson's § 1983 claim. Id. at 654("[I]f a governmental employer has violated Title VII, it has also violated the guarantees of the first amendment.").
 
 
 41
 I would also reverse and remand with respect to Lawson's claim of an independent § 1983 claim based on the remarks of Captain Porter after Lawson's resignation. Viewing the evidence in Lawson's favor, as we must, the WSP violated Lawson's right to religious freedom under Title VII and the First Amendment by constructively discharging him. Lawson gave the WSP yet another opportunity to right its wrong after his involuntary resignation; hoping to be reinstated, Lawson contacted Captain Porter the day after he left the WSP Academy to inquire further about whether the WSP could accommodate his religious beliefs. Had Captain Porter agreed to Lawson's request for accommodation and reinstatement, Lawson would have had no need to bring suit to obtain the relief he now seeks.
 
 
 42
 Instead, Captain Porter refused to offer any accommodation. He insisted that, if Lawson wanted to be a state trooper, he would have to salute the flag and take the oath as written. This response was a continuation of the WSP's discrimination against Lawson because of his religious beliefs. The WSP had a continuing legal duty to not bar Lawson from the WSP Academy merely because of his religious beliefs. Captain Porter breached that duty.
 
 III.
 Conclusion
 
 43
 Lawson's sincerely held religious beliefs prevent him from saluting the flag or swearing true faith and allegiance to the state and the nation as required by the rules of the WSP Academy. Based on a reading of the WSP's basic training manual, Lawson reasonably believed that his failure to perform these acts would result in discipline or discharge for insubordination. In hopes of resolving this conflict, Lawson explained his dilemma to his advisors and superiors and specifically requested accommodation prior to resigning. His advisors and superiors flatly refused, sending the message that Lawson had only two choices: compromise his religious beliefs or resign. The majority's attempt to call this a voluntary resignation as a matter of law defies logic and is contrary to the law.
 
 
 44
 Viewing the evidence in the light most favorable to Lawson, I conclude there are triable issues as to whether the WSP constructively discharged Lawson because of his religion. The district court erred in granting the WSP's motion for summary judgment as to Lawson's Title VII claim and in dismissing Lawson's claims under § 1983. I would reverse and remand for trial.