Richard D. PETERSON,
Plaintiff–Appellant,

v.

HEWLETT–PACKARD CO., a
corporation, Defendant–
Appellee.

No. 01–35795.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 4, 2003.

Filed Jan. 6, 2004.

Christ T. Troupis, Troupis & Summer Law Office, Meridian, ID; and Kenneth D. Nyman, Anderson, Julian & Hull, LLP, Boise, ID, for the plaintiff-appellant.

William L. Mauk and Grant T. Burgoyne, Mauk & Burgoyne, Boise, ID, for the defendant-appellee.

Before: REINHARDT, W. FLETCHER, and GOULD, Circuit Judges.

REINHARDT, Circuit Judge:

In this religious discrimination action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and Idaho law, Richard Peterson claims that his former employer, the Hewlett–Packard Company, engaged in disparate treatment by terminating him on account of his religious views and that it failed to accommodate his religious beliefs. The district court granted Hewlett–Packard's motion for summary judgment on the grounds that: 1) Peterson failed to raise an inference of disparate treatment and 2) accommodating Peterson's beliefs would inflict undue hardship upon Hewlett–Packard. We affirm.

## I. Background

Peterson was employed in the Boise, Idaho office of Hewlett–Packard for almost 21 years prior to his termination. The parties do not dispute that Peterson's job performance was satisfactory. The conflict between Peterson and Hewlett–Packard arose when the company began displaying "diversity posters" in its Boise office as one component of its workplace diversity campaign. The first series consisted of five posters, each showing a photograph of a Hewlett–Packard employee above the caption "Black," "Blonde," "Old," "Gay," or "Hispanic." Posters in the second series included photographs of the same five employees and a description of the featured employee's personal interests, as well as the slogan "Diversity is Our Strength."

Peterson describes himself as a "devout Christian," who believes that homosexual activities violate the commandments contained in the Bible and that he has a duty "to expose evil when confronted with sin." In response to the posters that read "Gay," Peterson posted two Biblical scriptures on an overhead bin in his work cubicle. The scriptures were printed in a typeface large enough to be visible to co-workers, customers, and others who passed through an adjacent corridor. One of Peterson's postings was taken from II Corinthians 10:12. The other featured the following passage from Isaiah:

> The shew of their countenance doth witness against them; and they declare their sin as Sodom, they hide it not. Woe unto their soul! For they have rewarded evil unto themselves. Isaiah 3:9

Subsequently, Peterson posted a third scriptural passage. This time he chose the well-known and highly controversial passage from Leviticus:

> If a man also lie with mankind, as he lieth with a woman, both of them have committed an abomination; they shall

surely be put to death; their blood shall be put upon them. Leviticus 20:13

Peterson's direct supervisor removed the scriptural passages after consulting her supervisor and determining that they could be offensive to certain employees, and that the posting of the verses violated Hewlett–Packard's policy prohibiting harassment. Throughout the relevant period, Hewlett–Packard's harassment policy stated as follows:

> Any comments or conduct relating to a person's race, gender, religion, disability, age, sexual orientation, or ethnic background that fail to respect the dignity and feeling [sic] of the individual are unacceptable.

Over the course of several days after Peterson posted the Biblical materials, he attended a series of meetings with Hewlett–Packard managers, during which he and they tried to explain to each other their respective positions. Peterson explained that he meant the passages to communicate a message condemning "gay behavior." The scriptural passages, he said, were "intended to be hurtful. And the reason [they were] intended to be hurtful is you cannot have correction unless people are faced with truth." Peterson hoped that his gay and lesbian co-workers would read the passages, repent, and be saved.

In these meetings, Peterson also asserted that Hewlett–Packard's workplace diversity campaign was an initiative to "target" heterosexual and fundamentalist Christian employees at Hewlett–Packard, in general, and him in particular. Ultimately, Peterson and the managers were unable to agree on how to resolve the conflict. Peterson proposed that he would remove the offending scriptural passages if Hewlett–Packard removed the "Gay" posters; if, however, Hewlett–Packard would not remove the posters, he would not re-move the passages. When the managers rejected both options, Peterson responded: "I don't see any way that I can compromise what I am doing that would satisfy both [Hewlett–Packard] and my own conscience." He further remonstrated: "as long as [Hewlett–Packard] is condoning [homosexuality] I'm going to oppose it...."

Peterson was given time off with pay to reconsider his position. When he returned to work, he again posted the scriptural passages and refused to remove them. After further meetings with Hewlett–Packard managers, Peterson was terminated for insubordination.

Following receipt of a right to sue notice from the EEOC, Peterson filed a complaint alleging religious discrimination in violation of Title VII and the Idaho Human Rights Act; wrongful discharge in violation of public policy; and other state law claims that he later dropped. Both parties moved for summary judgment. The district court granted Hewlett–Packard's motion and denied Peterson's.

## II. Analysis

■ We review the district court's order granting summary judgment *de novo*. *Balint v. Carson City*, 180 F.3d 1047, 1050 (9th Cir.1999) (en banc).

Title VII makes it unlawful for an employer "to discharge any individual ... because of such individual's ... religion[.]" 42 U.S.C. § 2000e–2(a)(1). "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j); *see also Lawson v. Washington*, 296 F.3d 799, 804 (9th Cir.

2002); *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 681 (9th Cir.1998). Our analysis of Peterson's religious discrimination claims under the Idaho Human Rights Act is the same as under Title VII. *See Sengupta v. Morrison–Knudsen Co.*, 804 F.2d 1072, 1077 (9th Cir.1986) (citing *Bowles v. Keating*, 100 Idaho 808, 812, 606 P.2d 458 (1979)). Therefore, our analysis of the Title VII claims also disposes of the Idaho state claims.

A claim for religious discrimination under Title VII can be asserted under several different theories, including disparate treatment and failure to accommodate. *See Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1017–18 (4th Cir.1996); *Mann v. Frank*, 7 F.3d 1365, 1368–70 (8th Cir.1993). In arguing that Hewlett–Packard discriminated against him on account of his religious beliefs, Peterson relies on both these theories.

**A. Disparate Treatment**

■ To survive summary judgment on his disparate treatment claim, Peterson must establish that his job performance was satisfactory and provide evidence, either direct or circumstantial, to support a reasonable inference that his termination was discriminatory. *Chalmers*, 101 F.3d at 1017. The amount of evidence that Peterson must produce is "very little," *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1124 (9th Cir.2000), so long as it is more than "purely conclusory allegations of alleged discrimination, with no concrete, relevant particulars." *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1419 (9th Cir.1988).

■ We analyze the evidence that Peterson presents in support of his disparate treatment claim under the *McDonnell Douglas* burden-shifting framework which he invokes. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this approach, Peterson has the burden of establishing a prima facie case by showing that (1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. *Chuang*, 225 F.3d at 1123; *Lyons v. England*, 307 F.3d 1092, 1112–14 (9th Cir. 2002); *Mandell v. County of Suffolk*, 316 F.3d 368, 377–78 (2d Cir.2003). It is with respect to the fourth requirement that Peterson's case fails.

■ Initially, we address Peterson's argument that Hewlett–Packard's workplace diversity campaign was "a crusade to convert fundamentalist Christians to its values," including the promotion of "the homosexual lifestyle." The undisputed evidence shows that Hewlett–Packard carefully developed its campaign during a three-day diversity conference at its Boise facility in 1997 and subsequent planning meetings in which numerous employees participated. The campaign's stated goal—and no evidence suggests that it was pretextual—was to increase tolerance of diversity. Peterson may be correct that the campaign devoted special attention to combating prejudice against homosexuality, but such an emphasis is in no manner unlawful. To the contrary, Hewlett–Packard's efforts to eradicate discrimination against homosexuals in its workplace were entirely consistent with the goals and objectives of our civil rights statutes generally. *See, e.g., Nichols v. Azteca Restaurant*, 256 F.3d 864, 870 (9th Cir.2001) (gender stereotyping violates Title VII); *Rene v. MGM Grand Hotel*, 305 F.3d 1061, 1067 (9th Cir.2002)

(en banc) (Title VII forbids same-sex harassment).

In addition to Peterson's allegations about the general purposes of the diversity initiative, he asserts that the campaign that Hewlett–Packard conducted, as well as "the entire disciplinary process" that it initiated in response to his posting of the scriptural passages, constituted "an inquisition serving no other purpose than to ferret out the extremity of Peterson's views on homosexuality."[1] According to Peterson, Hewlett–Packard managers harassed him in order to convince him to change his religious beliefs.[2] However, the evidence that Peterson cites in support of this theory shows that Hewlett–Packard managers acted in precisely the opposite manner. In numerous meetings, Hewlett–Packard managers acknowledged the sincerity of Peterson's beliefs and insisted that he need not change them. They did not object to Peterson's expression of his anti-gay views in a letter to the editor that was published in the *Idaho Statesman*—a letter in which Peterson stated that Hewlett–Packard was "on the rampage to change moral values in Idaho under the guise of diversity," and that the diversity campaign was a "platform to promote the homosexual agenda." Nor did the Hewlett–Packard managers prohibit him from parking his car in the company lot even though he had affixed to it a bumper sticker stating,

"Sodomy is Not a Family Value." All that the managers did was explain Hewlett–Packard's diversity program to Peterson and ask him to treat his co-workers with respect. They simply requested that he remove the posters and not violate the company's harassment policy—a policy that was uniformly applied to all employees. No contrary inference may be drawn from anything in the record.

Peterson also maintains that the disciplinary proceedings and his subsequent termination stand in marked contrast to Hewlett–Packard's treatment of three other groups of similarly-situated employees. Peterson compares himself, first, to the employees who hung the diversity posters. He argues that these posters were intended "to make people uncomfortable so they would think again about diversity and change their actions to be more positive." He likens these actions to his own intentions to make his "scriptures [ ] hurtful so that people would repent (change their actions) and experience the joys of being saved."[3] This comparison fails because the employees who hung the diversity posters were simply communicating the views of Hewlett–Packard as they were directed to do by management, whereas Peterson was expressing his own personal views which contradicted those of management. Moreover, unlike Peterson's postings, the company's workplace diversity

1. Although Hewlett Packard placed one of the "Gay" posters next to Peterson's cubicle, he offers no evidence supporting his assertion that the placement of the poster was intended to target him.

2. Peterson's complaint did not allege either a religious harassment or a hostile work environment claim. Likewise, no such claim was asserted before the EEOC or the Idaho Human Rights Commission.

3. Peterson states that there is no evidence that anyone at Hewlett–Packard "even understood" the meaning of the scripture passages

that he posted, and that the meaning he intended was revealed only in response to questions asked in his private meetings with Hewlett–Packard managers. However, he does not explain how he intended the passages to encourage people to be saved if they could not be understood. Even assuming that the messages conveyed by the first two scriptural passages that he posted were ambiguous, the third passage is unabashedly direct in its condemnation of homosexuals. Moreover, Peterson's intention that his postings be "hurtful" is sufficient for the purposes of our analysis.

campaign did not attack any group of employees on account of race, religion, or any other important individual characteristic. To the contrary, Hewlett–Packard's initiative was intended to promote tolerance of the diversity that exists in its workforce. Hewlett–Packard's failure to fire employees for following management's instructions to hang the posters prepared by management provides no evidence of disparate treatment.

Second, Peterson compares himself with other employees who posted religious and secular messages and symbols in their work-spaces. Yet Peterson failed to present any evidence that the posters in other Hewlett–Packard employees' cubicles were intended to be "hurtful" to, or critical of, any other employees or otherwise violated the company's harassment policy. In fact, the only posters in other employees' workspaces that Peterson identified were of "Native American dream catchers," "New Age pictures of whales," and a yin-yang symbol.

Third, Peterson argues that he was similarly situated to the network group of homosexual employees that Hewlett–Packard permitted to organize in the workplace and advertise in the company's email and its newsletter.[4] Yet Peterson failed to present any evidence that communications from this network group were, let alone were intended to be, hurtful to any group of employees. Nor does anything in the record indicate that Hewlett–Packard permitted or would have permitted any network group or any individual employee to post messages of either a secular or religious variety that demeaned other employees or violated the company's harassment policy.

In short, we conclude that Peterson's evidence does not meet the threshold for defeating summary judgment in disparate treatment cases. *Chuang*, 225 F.3d at 1124. Peterson offered *no* evidence, circumstantial or otherwise, that would support a reasonable inference that his termination was the result of disparate treatment on account of religion.[5] Viewing the record in the light most favorable to Peterson, it is evident that he was discharged, not because of his religious beliefs, but because he violated the company's harassment policy by attempting to generate a hostile and intolerant work environment and because he was insubordinate in that he repeatedly disregarded the company's instructions to remove the demeaning and degrading postings from his cubicle.

4. While Hewlett–Packard prohibited religious network groups at one time, its policy when Peterson was terminated was to "approve groups of employees of various faiths if their character, purpose and proposed activities focus on professional development and teamwork." This is the same policy that applied to every other group of workers that Hewlett–Packard permitted to organize within the workplace. There is no evidence that Hewlett–Packard approved any network group, the purpose of which was to violate its harassment policies or demean the views, conduct, or lifestyle of other workers.

5. In *Tucker v. California Dep't of Educ.*, 97 F.3d 1204 (9th Cir.1996), we expressed concern that a state agency's prohibition on religious posting in the workplace constituted viewpoint discrimination in violation of the First Amendment because it "silenc[ed] religious perspectives on controversial subjects." We illustrated these concerns by explaining the prohibition's potential impact on a hypothetical sign "stating that 'gay marriage is a sin,' and quoting passages from the Bible to support that proposition." *Id.* at 1216. Hewlett–Packard, however, is a private employer rather than a state agency. Thus, we do not need to reach the First Amendment concerns raised in *Tucker.* We do note, however, that an employee's opposition to a policy of his employer or his advocacy regarding a controversial public issue invokes different considerations than his expressive activity intended to demean or degrade co-workers.

## B. Failure to Accommodate

Peterson also appeals the district court's rejection of his failure-to-accommodate theory of religious discrimination. A plaintiff who fails to raise a reasonable inference of disparate treatment on account of religion may nonetheless show that his employer violated its affirmative duty under Title VII to reasonably accommodate employees' religious beliefs. *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977); *Chalmers,* 101 F.3d at 1017–18.[6] To establish religious discrimination on the basis of a failure-to-accommodate theory, Peterson must first set forth a prima facie case that (1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement. *Heller v. EBB Auto. Co.,* 8 F.3d 1433, 1438 (9th Cir.1993). If Peterson makes out a prima facie failure-to-accommodate case, the burden then shifts to Hewlett–Packard to show that it "initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." *Tiano,* 139 F.3d at 681; *Lawson,* 296 F.3d at 804.

As we explain below, it is readily apparent that the only accommodations that Peterson was willing to accept would have imposed undue hardship upon Hew-lett–Packard. Therefore, we will assume *arguendo* that Peterson could establish a prima facie case that his posting of the anti-gay scriptural passages stemmed from his religious beliefs that homosexual activities "violate the commandments of God contained in the Holy Bible" and that those same religious beliefs imposed upon him "a duty to expose evil when confronted with sin." We make that assumption with considerable reservations, however, because we seriously doubt that the doctrines to which Peterson professes allegiance compel any employee to engage in either expressive or physical activity designed to hurt or harass one's fellow employees.

An employer's duty to negotiate possible accommodations ordinarily requires it to take "some initial step to reasonably accommodate the religious belief of that employee." *Heller,* 8 F.3d at 1440. Peterson contends that the company did not do so in this case even though Hewlett–Packard managers convened at least four meetings with him. In these meetings, they explained the reasons for the company's diversity campaign, allowed Peterson to explain fully his reasons for his postings, and attempted to determine whether it would be possible to resolve the conflict in a manner that would respect the dignity of Peterson's fellow employees. Peterson, however, repeatedly made it clear that only two options for accommodation would be acceptable to him, either that (1) both the "Gay" posters and anti-gay messages remain, or (2) Hewlett–Packard remove the "Gay" posters and he would then re-

---

**6.** The Fourth Circuit has explained:

> For example, an employee who is terminated for refusing to work on Sundays can maintain an accommodation claim even if other nonreligious employees were also fired for refusing Sunday work, and even though the employer's proffered reason for the discharge—the refusal to perform required Sunday work—is legitimate and nondiscriminatory (because the Sunday work rule applies to all employees, regardless of religion). If the employee has notified the employer of his religious need to take Sundays off, the burden rests on the employer to show that it could not accommodate the employee's religious practice without undue hardship.

*Chalmers,* 101 F.3d at 1018.

move the anti-gay messages.[7] Given Peterson's refusal to consider other accommodations, we proceed to evaluate whether one or both of the "acceptable" accommodations would have imposed undue hardship upon Hewlett–Packard, or to put in it terms of *Tiano* and *Lawson*, to determine whether Hewlett–Packard carried its burden of showing that no reasonable accommodation was possible. *Tiano*, 139 F.3d at 681; *Lawson*, 296 F.3d at 804.

As we explain further below, Peterson's first proposed accommodation would have compelled Hewlett–Packard to permit an employee to post messages intended to demean and harass his co-workers. His second proposed accommodation would have forced the company to exclude sexual orientation from its workplace diversity program. Either choice would have created undue hardship for Hewlett–Packard because it would have inhibited its efforts to attract and retain a qualified, diverse workforce, which the company reasonably views as vital to its commercial success; thus, neither provides a reasonable accommodation.

 With respect to Peterson's first proposal, an employer need not accommodate an employee's religious beliefs if doing so would result in discrimination against his co-workers or deprive them of contractual or other statutory rights. *See Hardison*, 432 U.S. at 81, 97 S.Ct. 2264; *Opuku–Boateng v. California*, 95 F.3d 1461, 1468 (9th Cir.1996). Nor does Title VII require an employer to accommodate an employee's desire to impose his religious beliefs upon his co-workers. *Chalmers*, 101 F.3d at 1021; *Wilson v. U.S. West Communications*, 58 F.3d 1337, 1342 (8th Cir.1995).

That is not to say that accommodating an employee's religious beliefs creates undue hardship for an employer merely because the employee's co-workers find his conduct irritating or unwelcome. Complete harmony in the workplace is not an objective of Title VII. "If relief under Title VII can be denied merely because the majority group of employees, who have not suffered discrimination, will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed." *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 775, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) (*quoting U.S. v. Bethlehem Steel Corp.*, 446 F.2d 652, 663 (2d Cir.1971)). While Hewlett–Packard must tolerate some degree of employee discomfort in the process of taking steps required by Title VII to correct the wrongs of discrimination, it need not accept the burdens that

7. At oral argument, Peterson's counsel suggested for the first time two further accommodations that, he said, Peterson would have accepted: 1) Hewlett–Packard could have moved Peterson's cubicle to an isolated area where "nobody would have seen him," or 2) Hewlett–Packard could have designated a remote area as a "diversity forum" in which employees would be permitted to hang "non-offensive" posters regarding a variety of topics. There is no indication that Peterson ever proposed these accommodations to Hewlett–Packard, or, indeed, that anyone ever mentioned them prior to oral argument. They also do not appear to accommodate the religious requirements on which Peterson's accommodation claim relies. Peterson contends that he was compelled by his religion to speak out regarding his objection to the "Gay" posters, and in particular to confront his gay and lesbian co-workers with his view of the truth. These suggested accommodations, however, would have prevented Peterson from reaching his audience. Most of his co-workers would not have seen passages posted in a remote cubicle or in a remote diversity forum. Furthermore, if only non-offensive posters would have been permitted in the diversity forum, Peterson would have been prevented from expressing his views there, inasmuch as Peterson's posters were intended to be—and indeed were—offensive to gay employees.

would result from allowing actions that demean or degrade, or are designed to demean or degrade, members of its workforce. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Thus, we conclude that Peterson's first proposed accommodation would have created undue hardship for his employer.

The only other alternative acceptable to Peterson—taking down all the posters—would also have inflicted undue hardship upon Hewlett–Packard because it would have infringed upon the company's right to promote diversity and encourage tolerance and good will among its workforce. The Supreme Court has acknowledged that "the skills needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints." *Grutter v. Bollinger,* 539 U.S. 306, ——, 123 S.Ct. 2325, 2340, 156 L.Ed.2d 304 (2003) (citing amici briefs submitted by leading American corporations including Hewlett–Packard). These values and good business practices are appropriately promoted by Hewlett–Packard's workplace diversity program. To require Hewlett–Packard to exclude homosexuals from its voluntarily-adopted program would create undue hardship for the company. *Cf. Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (Colorado state constitutional amendment prohibiting state or local government action to protect persons based on their homosexual status, conduct, or orientation violates Equal Protection Clause).

Because only two possible accommodations were acceptable to Peterson and implementing either would have imposed undue hardship upon Hewlett–Packard, we conclude that the company carried its burden of showing that no reasonable accommodation was possible, and we therefore reject Peterson's failure-to-accommodate claim.

## C. Public Policy

Peterson argues that his termination also violated public policy, for the same reasons that it violated Title VII and the Idaho Human Rights Act. Having found the employment discrimination claims to be without merit, the public policy claim must also fail.

## Conclusion

Peterson failed to raise a triable issue of fact that his termination from employment at Hewlett–Packard was on account of his religious beliefs. The ruling of the district court is therefore

**AFFIRMED.**