**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MONICA L. MCDOWELL ELVIG,
  *Plaintiff-Appellant,*

v.

CALVIN PRESBYTERIAN CHURCH;
WILL ACKLES,
  *Defendants-Appellees.*

No. 02-35805

D.C. No.
CV-02-00626-BJR
Western District of
Washington,
Seattle

ORDER

Filed February 11, 2005

Before: Stephen S. Trott, Raymond C. Fisher and
Ronald M. Gould, Circuit Judges.

Order;
Concurrence by Judge W. Fletcher;
Concurrence by Judge Kozinski;
Dissent by Judge Kleinfeld;
Dissent by Judge Gould;
Dissent by Judge Bea

## ORDER

Judge Fisher has voted to deny the petition for rehearing en banc, and Judges Trott and Gould have voted to grant the petition for rehearing en banc.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc, and the matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

1675

The petition for panel rehearing en banc, filed August 4, 2004, is **DENIED.**

---

W. FLETCHER, Circuit Judge, with whom KOZINSKI, GRABER, and FISHER, Circuit Judges, join, concurring in the order denying rehearing en banc:

Each of the dissents from the denial of rehearing en banc recognizes that our decision in this case follows our earlier decision in *Bollard v. California Province of the Society of Jesu*s, 196 F.3d 940 (9th Cir. 1999). Judge Kleinfeld, Judge Gould, and Judge Bea contend that both *Bollard* and the case before us constitute constitutionally forbidden intrusions into the employment relationship between a church and its minister. Judge Kleinfeld also contends that our decisions in *Bollard* and this case conflict with the decisions of our sister circuits.

I disagree with both contentions. I write to emphasize that the rule announced in *Bollard* and applied in this case is consistent with the constitutional underpinnings of the ministerial exception, and that every court that has addressed a minister's ability to recover damages for sexual harassment has reached the same conclusion we have.

I.   Intrusion into the Relationship Between a Church and Its Minister

Title VII does not contain an exception for plaintiffs employed as ministers. Rather, the "ministerial exception" to Title VII is carved out from the statute based on the commands of the Free Exercise and Establishment Clauses of the First Amendment. Because the "ministerial exception" is carved out of the otherwise applicable requirements of Title VII, the scope of the exception is limited to that which is required by the First Amendment. The ministerial exception

protects the church's interest in choosing its ministers, and in deciding on the duties to be performed by those ministers. For example, the ministerial exception permits the Catholic Church to restrict the priesthood to men, and permits a church to prescribe the duties of a minister, free from scrutiny under Title VII.

In both *Bollard* and this case, the appeals came to us on motions to dismiss under Rule 12(b)(6) and on the pleadings under Rule 12(c) or 12(h)(2). We therefore assumed the truth of the allegations in the complaints. In *Bollard*, a Jesuit novice complained of repeated unwelcome homosexual sexual advances during a six-year period by his superiors in the Jesuit order. Bollard brought the offensive conduct to the attention of priests within the Jesuit hierarchy, but got no response. He finally resigned his position and brought suit for damages for sexual harassment under Title VII.

Bollard was not fired from his position as a Jesuit novice. Indeed, the Jesuits were entirely satisfied with his job performance and urged him to stay. Nor did Bollard seek reinstatement or changes in his duties. He sought only compensatory damages for the harm he suffered from the sexual harassment to which he had been subjected. We allowed his suit seeking such damages to go forward.

In this case, Elvig was an associate pastor of Calvin Presbyterian Church. She was subjected to sexual harassment by her superior, the pastor at her church. She complained of the offending conduct to appropriate church authorities, who took no action to stop the harassment. The pastor then retaliated against her for having complained about the harassment. Elvig filed a complaint with the EEOC. She was thereafter terminated from her ministry at Calvin Presbyterian Church, and was prevented from seeking employment as a pastor in other Presbyterian churches.

We declined to allow damages to Elvig for having been terminated, or for having been prevented from seeking ministe-

rial employment at other churches. We held that those actions came within the ministerial exception to Title VII, and that damages for these actions would have constituted an unconstitutional intrusion into the ministerial relationship. On the other hand, following *Bollard*, we allowed Elvig to seek damages for the sexual harassment and retaliation to which she was subjected:

> [T]he termination of Elvig's ministry and her inability to find other pastoral employment are consequences of protected employment decisions. Consequently, a damage award based on lost or reduced pay Elvig may have suffered from those employment decisions would necessarily trench on the Church's protected ministerial decisions. The same would be true of emotional distress or reputational damages attributable to those decisions. On the other hand, Elvig may recover for emotional distress and reputational harm caused by the sexual harassment itself — or by retaliatory harassment — because such harassment implicates . . . decisions the ministerial exception does not protect.

*Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 966 (9th Cir. 2004).

Our holdings in *Bollard* and this case were narrow: (1) In *Bollard*, the plaintiff did not seek reinstatement or damages based on a failure to reinstate. In this case, we did not allow Elvig a remedy that would have compelled the Church to permit her to seek other ministerial employment, and did not allow damages resulting from Elvig's termination and inability to obtain other ministerial employment. (2) In neither *Bollard* nor this case did we require the defendant churches to articulate a religious justification for their decisions to hire, fire, promote, or proscribe the duties of ministers. In *Bollard*, we noted that the church explicitly disavowed any religious justification for the homosexual sexual harassment to which

Bollard had been subjected, leaving unaddressed the question of whether sexual harassment based on a religious justification was constitutionally protected. In this case, the church did not assert a religious justification for the sexual harassment to which Elvig claimed she was subjected; it denied that it occurred at all.

Judge Kleinfeld contends that the availability of damages against a church for sexual harassment necessarily interferes with the church's constitutionally protected decision to hire and retain its ministers. He writes,

> [T]o prevent lawsuits alleging sexual harassment, churches will fire ministers who they think expose them to risk of damage awards and hire those who they think will not. So the *Elvig* majority's opinion does indeed impinge on churches' hiring and firing decisions.

Kleinfeld dissent at 1692. This argument proves too much. Under Judge Kleinfeld's reasoning, an altar boy's suit against the church for sexual abuse by a minister is constitutionally forbidden. Damages in such suits are likely to be higher than the limited damages available in Title VII sexual harassment suits brought by ministers. In addition, the number of sexual abuse suits brought by parishioners dwarfs the few sexual harassment suits that have been, and are likely to be, brought by ministers. The effect of sexual abuse suits brought by parishioners on the employment practices of the church is thus almost certain to be far greater than the effect of sexual harassment suits by ministers. Yet it is clearly established law that such suits are not constitutionally barred, *see, e.g., Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 430-31 (2d Cir. 1999); *Nutt v. Norwich Roman Catholic Diocese*, 921 F. Supp. 66, 72-74 (D. Conn. 1995); *Moses v. Diocese of Colorado*, 863 P.2d 310, 319-21 (Colo. 1993), and I do not believe that Judge Kleinfeld would advocate a change in that law.

Judge Kleinfeld contends that the precedents allowing suits seeking to redress sexual abuse by a minister can be distinguished because "criminal and civil law applicable to sexual abuse of a parishioner does not regulate a church's selection, training, and supervision of its own ministers." Kleinfeld dissent at 1701. But under his own reasoning, this is not so. If the threat of damage awards in suits arising out of sexual abuse of parishioners is even greater than in Title VII sexual harassment suits (as I believe it is), such suits not only "regulate a church's selection, training, and supervision of its own ministers," to use Judge Kleinfeld's phrase. They "regulate" to an even greater extent than sexual harassment suits. Yet Judge Kleinfeld recognizes that sexual abuse suits are permissible under the First Amendment. So it cannot be that the First Amendment prohibits suits simply because they have the potential to affect (or "regulate") churches' hiring and firing decisions.

The First Amendment does not exempt religious institutions from all statutes that regulate employment. For example, the First Amendment does not exempt religious institutions from laws that regulate the minimum wage or the use of child labor, even though both involve employment relationships. *See Employment Div. v. Smith*, 494 U.S. 872, 888 (1990) (*citing Tony and Susan Alamo Foundation v. Sec'y of Labor*, 471 U.S. 290 (1985) (minimum wage); *Prince v. Massachusetts*, 321 U.S. 158 (1944) (child labor)). The First Amendment protects a church's right to hire, fire, promote, and assign duties to its ministers as it sees fit not because churches are exempt from all employment regulations (for they are not), but rather because judicial review of those particular employment actions would interfere with rights guaranteed by the First Amendment. As we explained in *Bollard*, suits seeking damages for sexual harassment do not pose a threat to First Amendment rights, and are therefore permitted.

Judge Bea contends that the availability of suits against a church for sexual harassment will produce unconstitutionally

intrusive inquiries into church affairs whenever a church asserts a defense under *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742 (1998), that it exercised reasonable care to prevent and correct the harassment. He misunderstands the scope of the *Ellerth* inquiry. As we wrote in *Bollard*:

> [The *Ellerth* inquiry] is a restricted inquiry. Nothing in the character of this defense will require a jury to evaluate religious doctrine or the "reasonableness" of the religious practices followed within the Jesuit order. Instead, the jury must make secular judgments about the nature and severity of the harassment and what measures, if any, were taken by the Jesuits to prevent or correct it. The limited nature of the inquiry, combined with the ability of the district court to control discovery, can prevent a wide-ranging intrusion into sensitive religious matters.

196 F.3d at 950; *see also Elvig*, 375 F.3d at 963 ("The reasonableness component of the *Ellerth/Faragher* affirmative defense evaluates an employer's *actions* in responding to sexual harassment rather than the motivations for that response." (emphasis in original)). A court inquiring into the reasonableness of the steps a church has taken to prevent or correct sexual harassment need "intrude no further in church autonomy . . . than [a court does], for example, in allowing parishioners' civil suits against a church for the negligent supervision of ministers who have subjected them to inappropriate sexual behavior." *Bollard*, 196 F.3d at 947-48 (citing *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 10 F. Supp. 2d 138 (D.Conn. 1998); *Nutt,* 921 F. Supp. at 66; *Moses*, 863 P.2d at 310).

## II.   Decisions of Other Circuits

The lead case establishing the contours of the ministerial exception is *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972). The *McClure* court wrote:

> The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern. Just as the initial function of selecting a minister is a matter of church administration and government, so are the functions which accompany such a selection. It is unavoidably true that these include the determination of a minister's salary, his place of assignment, and the duty he is to perform in the furtherance of the religious mission of the church.

*Id.* at 558-59.

A sexual harassment claim is an unusual claim under Title VII (and, indeed, for that reason was somewhat slow to be accepted as part of Title VII). It is not a claim based upon gender or racial inequality in hiring, firing, promotions, or duties, as in *McClure*. Rather, it is a kind of statutory tort suit, allowing a damage recovery for sex discrimination in the form of sexually-based abusive behavior by co-workers in the workplace.

When we decided *Bollard*, only one court had confronted a directly comparable situation, in which a minister sought damages from a church for sexual harassment by another minister. The case was *Black v. Snyder*, 471 N.W.2d 715 (Minn. Ct. App. 1991), in which the Minnesota Court of Appeals held that there was no constitutional bar to a sexual harassment claim for damages brought by a pastor. Since *Bollard*, two more courts have confronted directly comparable situations. Both courts came to the same conclusion we did. The opinions in both cases extensively quote from, and rely on, our analysis in *Bollard. See McKelvey v. Pierce*, 800 A.2d 840 (N.J. 2002) (New Jersey Supreme Court sustained a claim for damages brought by a priesthood candidate based on sex-

ual harassment); *Dolquist v. Heartland Presbytery*, 342 F. Supp. 2d 996 (D. Kans. 2004) (district court sustained a claim for damages brought by a pastor for sexual harassment). No court confronting a sexual harassment claim for damages brought by a minister or would-be minister — before or after *Bollard* — has disagreed with *Bollard*.

Judge Kleinfeld contends that we have departed in *Bollard* and in this case from the decisions of our sister circuits, but this is not true. In both cases, we cited and quoted *McClure* (as well as a number of cases following *McClure*), and indicated our full agreement with them. As we wrote in *Bollard*:

> These First Amendment restrictions on Title VII provide important protections to churches that seek to choose their representatives free from government interference and according to the dictates of faith and conscience.
>
> * * *
>
> A church's selection of its own clergy is [a] core matter of ecclesiastical governance with which the state may not constitutionally interfere. A church must retain unfettered freedom in its choice of ministers because ministers represent the church to the people. As the Fifth Circuit has written, they act as the church's "lifeblood." *McClure*, 460 F.2d at 558.

196 F.3d at 945 (some citations omitted); *see also Elvig*, 375 F.3d at 961.

All of the circuit cases discussed and cited by Judge Kleinfeld in his dissent fall in the *McClure* line of cases, in which a church's decision to hire, to fire, and to prescribe the duties of its ministers was constitutionally protected. Judge Kleinfeld discusses five circuit cases in text. Kleinfeld dissent at 1696-98. Those cases, and their holdings, are as follows:

*Combs v. Central Texas Annual Conference of United Methodist Church*, 173 F.3d 343 (5th Cir. 1999) (church's decision to terminate minister held constitutionally protected); *Young v. Northern Ill. Conference of United Methodist Church*, 21 F.3d 184 (7th Cir. 1994) (church's decision to deny promotion and discharge probationary minister held constitutionally protected); *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir. 1985) (church's denial of pastoral position to applicant held constitutionally protected); *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698 (7th Cir. 2003) (church spokesperson, acting as a "minister" within the meaning of the exception, complained of having been given poor working conditions and replaced by a less qualified male; church's actions held constitutionally protected); *EEOC v. Catholic University of America*, 83 F.3d 455 (D.C. Cir. 1996) (nun, acting as a "minister" within the meaning of the exception, denied tenure in Department of Canon Law; church's decision held constitutionally protected). Judge Kleinfeld cites two additional cases in footnotes. Kleinfeld dissent at 1692 n.6, 1696 n.22. Those cases, and their holdings, are as follows: *Gellington v. Christian Methodist Episcopal Church*, 203 F.3d 1299 (11th Cir. 2000) (minister reassigned to less desirable church and forced to resign; church's actions held constitutionally protected); *McClure*, 460 F.2d 553 (5th Cir. 1972) (female minister received lower salary and fewer benefits than male ministers and ultimately terminated; church's actions held constitutionally protected). None of these circuit cases is inconsistent with our decisions in *Bollard* and in this case. Indeed, we made clear in both *Bollard* and this case that we agreed with the holdings in this line of cases.

## Conclusion

Our decisions in *Bollard* and this case are fully consistent with the First Amendment and the "ministerial exception" to Title VII. Under *Bollard* and this case, a church may hire, fire, promote, refuse to promote, and prescribe the duties of

its ministers, free from judicial scrutiny under Title VII. It need advance no justification, religious or otherwise, for such actions.

*Bollard* and this case do, however, hold that sexual harassment by a minister is not protected by the First Amendment. A church is required to comply with Title VII when a minister is sexually harassed by another minister employed by the church, just as a church is required to comply with state tort laws when a parishioner is sexually abused by a minister employed by the church. In neither of these circumstances is a church protected by the First Amendment.

In so holding, neither *Bollard* nor this case deviates from the holdings of other courts. No court has ever held that sexual harassment by a minister is protected by the First Amendment. In fact, every court confronted with the issue has held that it is not.

---

KOZINSKI, Circuit Judge, concurring in the order denying rehearing en banc:

Judge Kleinfeld's allegory to the infamous slaying of Archbishop (now Saint) Thomas Becket puzzles me. Judge Kleinfeld's point seems to be that lawsuits of the type brought by Elvig breach the " 'wall of separation' between church and state," Kleinfeld dissent at 1691, in the following way: Churches will have a reason to fire ministers like Will Ackles because they fear the cost and burden of civil liability, rather than because of their performance as ministers. *See id.* at 1700. And the ease of bringing such lawsuits, Judge Kleinfeld implies, can burden religion just as surely as direct government regulation (represented in its extreme form by *Murder in the Cathedral*).

While I oppose killing archbishops, either directly or softly with lawsuits, I don't understand how Judge Kleinfeld's

approach helps. Suppose Judge Kleinfeld is right, and it would violate religious liberty for Henry Plantagenet to rid himself of Becket by getting Elvig's ur-grandmother to sue him on a trumped-up harassment claim. It seems to me that Henry could achieve the same effect—through the same means—by getting a church janitor or bookkeeper to bring the same claim. Yet the latter kind of suit is clearly not barred by the ministerial exception, which only applies to those "serving the function of ministers." *Bollard* v. *Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 947 (9th Cir. 1999); *see also EEOC* v. *Roman Catholic Diocese*, 213 F.3d 795, 800 (4th Cir. 2000).

Suits by parishioners or non-ministerial employees resting on generally applicable law are just as likely (if not more likely, *see* Fletcher concurrence at 1679) to affect the incentives to hire, fire and supervise ministers as suits by clergy: If Chaucer's Friar and his house are held liable for injuring a barmaid with his knives while collecting alms in a tavern, this may well cost the Friar his job and encourage mendicant orders to send out teetotalers. If the Monk and his monastery can be sued because he shot the Manciple while hunting for dinner, this will make the abbot less eager to accept monks with bows, even though they meet all the religious criteria for ordination. And this is the likely consequence whether the victim was the Knight, the Miller, the Wife of Bath or a fellow religious official like the Prioress.

What, then, makes Elvig's case so special? Judge Kleinfeld suggests that workplace sexual harassment, unlike other causes of action, falls within the ministerial exception because it is a species of employment discrimination and laws regulating it thus go to the heart of employer-employee relations. *See* Kleinfeld dissent at 1700 & n.37. But this is not a satisfactory answer: If sexual harassment suits are to fall within the First Amendment exception to Title VII, it must be because of the presence or absence of First Amendment concerns, *see* Fletcher concurrence at 1676-77, not because of the body of

law of their conception or what name they are baptized under. And this functional analysis is concerned not with mere effects on employment or supervision of employees, but with entanglement in internal church management. The risk of ongoing government involvement in internal processes is clear and substantial when the government interferes with actual hiring and firing, which is why Elvig cannot sue to get her job back or for wrongful termination damages. But letting Elvig recover damages for harassment does not regulate employment directly; at most, it may have a collateral effect on employment by changing the employer's incentives to retain or remove the accused employee. As such, damages suits by employees for sexual harassment are no more intrusive than parishioners' negligent supervision lawsuits based on molestation by priests. *See Elvig* v. *Calvin Presbyterian Church*, 375 F.3d 951, 968 & n.12 (9th Cir. 2004). Nor are they any more intrusive than run-of-the-mill intra-church lawsuits arising out of, say, on-the-job personal injuries.

Judge Kleinfeld offers a second rationale for extending the ministerial exception to lawsuits such as Elvig's: Such suits "regulate relationships among ministers" by targeting "water cooler talk" and other "mostly verbal" conduct which, in a church, "is probably about prayer and religious doctrine, just as among lawyers it is about law." Kleinfeld dissent at 1699. This argument holds no water either because the ministerial exception is both too broad and too narrow to remedy the problem Judge Kleinfeld envisions.

As it happens, Elvig is claiming that her harasser was another minister, but that's merely incidental. The ministerial exception applies, if at all, based on the plaintiff's status as a minister; the status of the accused harasser is irrelevant, so long as his actions can somehow be imputed to the church. *See, e.g.*, *Bollard*, 196 F.3d at 945 ("The ministerial exception to Title VII 'precludes civil courts from adjudicating employment discrimination suits by ministers against the church or religious institution employing them.' " (quoting *EEOC* v.

*Catholic Univ. of Am.*, 83 F.3d 455, 461 (D.C. Cir. 1996))). The harasser could be a fellow minister, a non-ministerial church employee, a lay member of the church's board of governors or even a member of the congregation. *See Folkerson* v. *Circus Circus Enters.*, 107 F.3d 754, 756 (9th Cir. 1997) ("[A]n employer may be held liable for sexual harassment on the part of a private individual . . . [if it] ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct."); 29 C.F.R. § 1604.11(e) (employer liability for sexual harassment by non-employees in the workplace). If a minister like Elvig were to claim sexual harassment by any of these people, her lawsuit would not implicate "water cooler talk" or other such verbal conduct "among ministers" for the simple reason that the alleged harasser would not be a minister. Yet the ministerial exception would cut off that claim just as surely as Elvig's claim against Will Ackles. In that sense, the exception sweeps far broader than the justification Judge Kleinfeld offers for it.

For much the same reason, Judge Kleinfeld's justification is too narrow to support the rule he proposes. Judge Kleinfeld fears that the risk of liability will cause churches to "squelch[ ]" ministers who preach male supremacy or condemn "certain marital or sexual conduct . . . in the hearing of a female associate pastor." Kleinfeld dissent at 1702-03. Yet female pastors are not the only ones who could be offended: A non-clerical employee, such as a female English teacher at a church-run elementary school, is perhaps even more likely to be offended and feel that "the environment is hostile to her work and denies her equality because of her sex." *Id.* at 1702. Yet the ministerial exception—which turns on the identity of the accuser, not that of the speaker—would do nothing in that case to protect the church or the minister who preaches such views. Denying Elvig her claim would thus not insulate the preacher or his employer in the long run from the consequences Judge Kleinfeld colorfully catalogues in his dissent. The proper way to protect church doctrine and ministers'

speech is not by shoehorning them into a Free Exercise and Establishment Clause exception to workplace discrimination law, but by giving them the full protection of another part of the First Amendment: the Free Speech Clause. *See generally* Eugene Volokh, Comment, *Freedom of Speech and Workplace Harassment*, 39 UCLA L. Rev. 1791 (1992).

Even then, I might see some merit in Judge Kleinfeld's approach if it offered the prospect that courts could avoid all direct entanglement in churchly processes—but it does not, and cannot. Since churches can invoke the ministerial exception only against those "serving the function of ministers," *see Bollard*, 196 F.3d at 947, courts applying the exception have to decide at the outset who fulfills a function "important to the spiritual and pastoral mission of the church" and who doesn't. *Roman Catholic Diocese*, 213 F.3d at 801 (quoting *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985)) (internal quotation marks omitted). Various cases have properly taken a functional approach and not insisted that the relevant party be "ordained" or a "minister" before applying the exception. *See id.* (citing cases involving a lay choir director, a member of a university's canon law faculty, a non-ordained associate in pastoral care and seminary faculty members). Thus, we routinely have to ask what function is served by altar servers, choirboys, lay ministers, lay deacons, ushers, acolytes and crucifers. Rabbis are clearly ministerial, but what about the gabbai, the shames, the cook in the synagogue's kitchen (who may have unorthodox views about whether swordfish is kosher)? Are mohels to be cut off from the ministerial exception altogether? What of the organizers of traditional Quaker meetings or the Mormon lay clergy? Religions vary drastically in their hierarchical and organizational structure, and it is often a tricky business to distinguish spiritual from administrative officials and clergy from congregation. The very invocation of the ministerial exception requires us to engage in entanglement with a vengeance. To call the *Bollard-Elvig* rule, which allows a damages suit under a generally applicable law, an unprecedented

"gate" in our " 'wall of separation' between church and state," *see* Kleinfeld dissent at 1691, is meaningless hyperbole.

Where the *Bollard-Elvig* approach would simply let Title VII suits like Elvig's go forward, Judge Kleinfeld's approach would require continually looking into church affairs to resolve the sensitive question whether a plaintiff is ministerial and therefore subject to the ministerial exception. While the question may be an easy one in Elvig's case, it may be quite difficult in other cases, as illustrated above. At best, then, Judge Kleinfeld swaps one entanglement for another one.

Thomas Becket himself had a different policy proposal, which could indeed insulate church decisionmaking from all secular interference: Clergymen accused of crimes could be called to account only under the authority of an ecclesiastical court, not the secular authorities. Now *that*'s a wall. Because we neither can nor wish to go that far, the kind of hermetic separation Judge Kleinfeld and the other dissenters envision is just not possible for religious institutions situated in the midst of our civilization. By practicing religion within our society, churches and their members necessarily undertake some of the burdens along with the benefits of civilized life. This will inevitably distort hiring and firing incentives to some degree, but it is both misguided and futile to seek to avoid all such effects.

The First Amendment does impose certain constraints on the application of general laws to churches, but showing that a class of lawsuits could have been disadvantageous to Thomas Becket isn't enough. Though I had my doubts about *Bollard* at the time, I now believe that adopting a broader ministerial exception would cause more problems than it solves. The *Bollard-Elvig* rule, which leaves the decision whether to hire or fire clergy with the religious institution, but subjects other decisions that may have a collateral effect on employment to the authority of the civil courts, strikes me as entirely workable. It is, in any event, the law we have, and

nothing the dissenters say convinces me that we could come up with something better by going en banc.

---

KLEINFELD, Circuit Judge, with whom, O'SCANNLAIN, CALLAHAN, and BEA, Circuit Judges, join, dissenting from denial of rehearing en banc:

For the one of every five Americans who live in our circuit's jurisdiction, the "wall of separation" between church and state now has a gate. The gate is one-way. The government may pass through to regulate the internal affairs of a church, but the church must remain on its own side. If King Henry II had lived in the Ninth Circuit, he would have won his struggle with Thomas Becket, Archbishop of Canterbury, without having to insinuate "Will no one rid me of this turbulent priest?"[1] to incite his knights to murder. Though King Henry's goals in the struggle were, among other things, to gain secular jurisdiction of disputes over ecclesiastical patronage and to require archbishops and bishops to get permission from him before leaving the country, he stopped short of asserting control of selection and expulsion of priests.[2] Since selection and expulsion of ministers are the only protected religious spheres in this court's shriveled version of the First Amendment, we would have granted him what he wished.

Elvig, a Presbyterian minister, brought Title VII sexual harassment and retaliation claims, claiming that a pastor at the church where she was an associate pastor created a hostile environment. The district court dismissed on the pleadings under the "ministerial exception" to Title VII, and we reversed.[3]

---

[1] *Oxford Dictionary of Quotations* 332 (4th ed. 1992).

[2] *See* the Constitutions of Clarendon, 1164, available at http://www.yale.edu/lawweb/avalon/medieval/constcla .htm, last visited January 24, 2005.

[3] *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951 (9th Cir. 2004).

The majority held that a minister cannot sue her church under Title VII for firing her, but can nevertheless sue it for sexual harassment and retaliation for complaining about sexual harassment. The majority left the church an affirmative defense, though, if doctrinal reasons justified the conduct of the minister's supervisors or fellow ministers. The majority applied and extended our previous decision allowing a Catholic novitiate's sexual harassment suit to proceed in *Bollard v. California Province of the Society of Jesus*.[4]

The *Elvig* majority purports to preserve the ministerial exception by saying that churches' hiring and firing decisions regarding ministers are not subject to Title VII, and that only churches' supervisory decisions that may subject their ministers to a hostile work environment are subject to Title VII. This is a false distinction. Churches' supervision of ministers is as important to church autonomy as churches' hiring and firing. In any case, to prevent lawsuits alleging sexual harassment, churches will fire ministers who they think expose them to the risk of damage awards and hire those who they think will not. So the *Elvig* majority's opinion does indeed impinge on churches' hiring and firing decisions.

Our crabbed application of the "ministerial exception" furthers an aggressively secularizing trend of the law in the Ninth Circuit[5] and sets us apart from all of our sister circuits that have ruled on the application of Title VII to ministers.[6]

---

[4]*Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940 (9th Cir. 1999).

[5]*Cf. Newdow v. U.S. Congress*, 292 F.3d 597, 612 (9th Cir. 2002) (holding that the teacher-led recitation of the Pledge of Allegiance including "under God" in public schools is unconstitutional), *rev'd sub nom. Elk Grove Unified Sch. Dist. v. Newdow*, 124 S. Ct. 2301 (2004).

[6]*See Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698 (7th Cir. 2003); *Gellington v. Christian Methodist Episcopal Church, Inc.*, 203 F.3d 1299, 1304 (11th Cir. 2000); *Combs v. Cen. Tex. Annual Conference of the United Methodist Church*, 173 F.3d 343 (5th Cir. 1999); *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455 (D.C. Cir. 1996); *Young v. N. Ill. Conference of United Methodist Church*, 21 F.3d 184 (7th Cir. 1994); *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir. 1985).

Although the Supreme Court has not spoken directly to the issue of the "ministerial exception," our decision puts us in tension with what the Court has said regarding judicial interference with churches.

Perhaps our egregious misinterpretation of the law stems in part from the poorly chosen name, the "ministerial *exception*." The real exception in Title VII is statutory.[7] The statutory exception allows churches to discriminate on the basis of religion when they hire employees. So, for example, a Presbyterian cannot sue under Title VII because the Catholic Church would not employ him as a priest. This statutory exception protects churches in their hiring and firing, which may explain why our circuit has concluded that the "ministerial exception" protects churches *only* in hiring and firing. However, what the cases call the "ministerial exception" in Title VII cases is not really an "exception" at all; rather, it is a limitation on Title VII imposed by the Constitution. The First Amendment entitles the people to be free of any law "respecting an establishment of religion, or prohibiting the free exercise thereof."[8] Where Title VII would operate as such a law—as all our sister circuits have held that it would if Title VII were applied to ministers of churches—it can have no force. Such an application violates two constitutional limitations on Congress, the Establishment Clause and the Free Exercise Clause.

I

In the bitter division of the Presbyterian Church during and

---

[7]The statutory exception to Title VII states "This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." 42 U.S.C. § 2000e-1(a).

[8]U.S. Const. amend. I.

after the Civil War, the Supreme Court held in *Watson v. Jones*[9] that the courts were bound by the decisions of the highest Presbyterian church authority, because "[a]ll who unite themselves to such a body do so with an implied consent to this government," and because it "would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed."[10] The Court repudiated the English rule, which required inquiry into whether the church had a justification in its own doctrine for what it did (a rule similar to the majority's religious justification defense adopted in *Elvig*), because the inquiry into religious principles would contradict the constitutional proposition that "[t]he law knows no heresy, and is committed to the support of no dogma, the establishment of no sect."[11]

In *Watson*, the Court was so wary of intruding into religious matters that it held the case under advisement for a year in the hope that the parties would settle it.[12] This wariness has continued uninterrupted to our time. In *Serbian Eastern Orthodox Diocese v. Milivojevich*,[13] the Supreme Court held that the First Amendment prohibited courts from inquiring into whether a church's governing body had power under religious law to decide a dispute as it did.[14] The Court concluded:

> In short, the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this

---

[9]*Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1871).

[10]*Id.* at 729.

[11]*Id.* at 728.

[12]*Id.* at 735.

[13]*Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976).

[14]*Id.* at 708.

choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them.[15]

*Milivojevich* made it clear that there was no arbitrariness exception to the First Amendment, and held that there was nothing that the courts could do about the church's decision to remove a bishop.

Elvig had vowed "to be governed by . . . Church[ ] polity, and to abide by its discipline."[16] Yet after she litigated her sexual harassment case through the Presbyterian church hierarchy and lost, she chose not to abide by the church polity's discipline. Instead, she subjected her church to the secular polity by bringing this lawsuit. *Milivojevich* holds that "the Constitution requires that civil courts accept . . . as binding upon them" the decisions of tribunals who adjudicate disputes over internal discipline within hierarchical religious organizations. Yet we as a court have now violated the holding of *Milivojevich* by refusing to accept the decision of the Permanent Judicial Commission of the Presbytery "as binding."

Pursuant to the Presbyterian Church's *Book of Order* and *Rules of Discipline,* the Permanent Judicial Commission of the Presbytery rejected Elvig's claims. The *Rules of Discipline*, which Elvig in this civil litigation accuses the church of violating, explain that "Church discipline is the church's exercise of authority given by Christ . . . the purpose of discipline is to honor God by making clear the significance of membership in the body of Christ."[17] The authority of the United States Courts is not "given by Christ" and the purposes we are authorized to advance do not include honoring "God by mak-

---

[15]*Id.* at 724-25.

[16]*Elvig*, 375 F.3d at 970 (9th Cir. 2004).

[17]*Elvig*, 375 F.3d at 973.

ing clear the significance of membership in the body of Christ." We have no business in this dispute.

## II

No other circuit has purported to revive the English rule requiring the church to show doctrinal justification for its conduct, no doubt because that rule was expressly rejected by the Supreme Court in *Watson*.[18] Yet the majority does just that by making it an affirmative defense that the church's conduct was a matter of religious doctrine.[19] Forcing churches to satisfy courts that their religious doctrines justify their conduct is just the sort of "excessive entanglement" that the First Amendment prohibits.[20] Because *Elvig* holds that the church cannot obtain dismissal on the pleadings, either the judge on summary judgment or the jury will have to examine Presbyterian theology and Presbyterian hierarchical doctrine to decide whether the church's supervision is doctrinally based. The incongruity of a secular court inquiring into whether a church's decisions are doctrinal, required by the majority opinion in *Elvig*, revives the English rule that the Supreme Court in *Watson* prohibited us from applying.

Our sister circuits that have spoken on the issue have thought it was quite plain before *Employment Division v. Smith*[21] that the Free Exercise Clause prohibited courts from adjudicating Title VII cases between churches and their ministers.[22] And after careful examination, they have concluded that *Smith* made no difference.[23] In *Combs v. Central Texas*

---

[18]*Watson*, 80 U.S. at 727-28.

[19]*Elvig*, 375 F.3d at 959, 964.

[20]*See Lemon v. Kurtzman*, 403 U.S. 602 (1971).

[21]*Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872 (1990).

[22]*See, e.g., McClure v. Salvation Army*, 460 F.2d 553, 558-60 (5th Cir. 1972).

[23]*See Gellington*, 203 F.3d at 1303; *Combs*, 173 F.3d at 349; *Catholic Univ. of Am.*, 83 F.3d at 462.

*Annual Conference of the United Methodist Church*, the Fifth Circuit held that a minister could not sue her Methodist church under Title VII for sex and pregnancy discrimination, even though no matters of religious dogma or ecclesiastical law were directly involved.[24] The Free Exercise Clause requires the ministerial exception, which is "designed to protect the freedom of the church to select those who will carry out its religious mission."[25] And because "in investigating employment discrimination claims by ministers against their church, secular authorities would necessarily intrude into church governance in a manner that would be inherently coercive, . . . we cannot conceive how the federal judiciary could determine whether an employment decision concerning a minister was based on legitimate or illegitimate grounds without inserting ourselves into a realm where the constitution forbids us to tread, the internal management of a church."[26] Likewise, the Seventh Circuit, in *Young v. Northern Illinois Conference of United Methodist Church*, rejected on Free Exercise grounds the Title VII claim of a Methodist probationary minister who was denied promotion and fired.[27]

The Eleventh Circuit rejected a Title VII retaliation claim by a minister in the Christian Methodist Episcopal Church, based on the Establishment Clause as applied under the *Lemon v. Kurtzman*[28] test, because "[i]nvestigation by a government entity into a church's employment of its clergy would almost always entail excessive government entanglement into the internal management of the church."[29] The Fourth Circuit, in *Rayburn v. General Conference of Seventh-Day Adventists*, expressly rejected the notion, adopted by the

---

[24]*Combs*, 173 F.3d at 345 n.1, 350.

[25]*Id.* at 349.

[26]*Id.* at 350.

[27]*Young*, 21 F.3d at 187.

[28]*Lemon v. Kurtzman*, 403 U.S. 602 (1971).

[29]*Gellington*, 203 F.3d at 1304.

*Elvig* majority, that such Title VII cases may go forward subject to a religious justification defense. The Fourth Circuit held that "we may not then inquire whether the reason for Rayburn's rejection had some explicit grounding in theological belief"[30] under the Free Exercise Clause and the Establishment Clause. The entanglement concern is especially strong in Title VII cases, the Fourth Circuit pointed out, because "questions of compliance may result in continued court surveillance" and "[t]here is the danger that churches, wary of EEOC or judicial review of their decisions, might make them with an eye to avoiding litigation or bureaucratic entanglement rather than upon the basis of their own personal and doctrinal assessments of who would best serve the pastoral needs of their members."[31] The Seventh Circuit in *Alicea-Hernandez v. Catholic Bishop of Chicago* likewise rejected the notion of a religious justification defense, because it would be inconsistent with the separation of church and state.[32]

The District of Columbia Circuit in *EEOC v. Catholic University of America* likewise held that a nun could not sue her Catholic institution under Title VII for denial of academic tenure, because even the government investigation that is a precursor to a Title VII claim may cause "excessive entanglement," in violation of the Establishment Clause.[33] The church would likely slant its own decisions away from religious doctrine to whatever was necessary to avoid the burden of litigation:

> [W]e think it is fair to say that the prospect of future investigations and litigation would inevitably affect to some degree the criteria by which future vacancies in the ecclesiastical faculties would be filled. Having once been deposed, interrogated, and haled into

[30]*Rayburn*, 772 F.2d at 1169.

[31]*Id.* at 1171.

[32]*Alicea-Hernandez*, 320 F.3d at 703.

[33]*Catholic Univ. of Am.*, 83 F.3d at 467-68.

court, members of the Department of Canon Law and of faculty review committees who are responsible for recommending candidates for tenure would do so "with an eye to avoiding litigation or bureaucratic entanglement rather than upon the basis of their own personal and doctrinal assessments of who would best serve . . . the needs" of the Department.[34]

Laws that regulate relationships among ministers curtail a church's autonomy in the establishment and propagation of its religious doctrines. Sexual harassment claims under Title VII are directed towards conduct, mostly verbal, among employees and between employees and employers. In this case, Elvig claimed in her complaint that a pastor had winked at her, made unwelcome remarks, and "undressed her with his eyes,"[35] complaints sufficiently vague and difficult to verify that they necessarily invite the most searching government examination of the details of what the pastors said to each other and in what manner. Since the water cooler talk among ministers is probably about prayer and religious doctrine, just as among lawyers it is about law and among doctors it is medicine, ministers' intra-office remarks cannot avoid entanglement with whatever may be Presbyterian theology. Where the Title VII violation is among ministers of a church, the government cannot regulate it without regulating religion itself. For this reason, Title VII regulation of the ministerial relationship interferes with a church's constitutionally protected autonomy in a way that state law tort protection of parishioners does not. Further, while no church will knowingly hire a minister who molests boys, it might well hire a minister who condemns some sex roles or sexual relationships as sinful. Defining and condemning sin pursuant to a religious doctrine is a substantial part of what ministers are trained to do. Yet this core religious conduct would expose the church to Title VII liability from another minister whose conduct was condemned as sin-

---

[34]*Id.* at 467 (quoting *Rayburn*, 772 F.2d at 1171).

[35]*Elvig*, 375 F.3d at 971.

ful.[36] Most insidiously, the effects of the *Elvig* regime will be, for the most part, invisible to the courts, because churches will have to change their own conduct, rules, and theological doctrine to avoid coming into contact with the apparatus of the state.

### III

The First Amendment bestows on churches the right to select, manage, and discipline their clergy free from government control and scrutiny. Our decisions in *Bollard* and *Elvig* gravely infringe on that right. Instead of first asking "how will this employment decision further our religious objective?," churches will be forced to ask "will this employment decision expose us to liability?" A church whose practices or informal doctrine clash with prevailing notions of sexual equality and expression could well find itself, like so many schools districts and prisons, under the supervision of a district court standing master. If a minister harps too much on the parts of the Bible that are currently not "politically correct," his church will likely feel compelled as a matter of prudence to shut him up or get rid of him to avoid Title VII suits from colleagues offended by his preaching.[37]

---

[36]*Cf. Peterson v. Hewlett-Packard Co.*, 358 F.3d 599 (9th Cir. 2004) (Corporation fired an employee for posting Biblical scriptures condemning homosexuality because the corporation viewed the employee's behavior as harassment).

[37]Judge W. Fletcher attempts to avoid the clear implications of *Elvig* for the hiring and firing that even he claims is constitutionally protected, by arguing that a "sexual harassment claim . . . is not a claim based upon gender or racial inequality in hiring, firing, promotions, or duties." That is incorrect. A sexual harassment claim under Title VII is indeed precisely what the quoted statement says it is not, a claim of employment discrimination based on sex. Title VII makes it an "unlawful employment practice" to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court construed Title VII to prohibit "sex-

Judge W. Fletcher's concurrence in the order denying rehearing en banc adds—and adds error—to the opinion it defends. The core of the error is Judge Fletcher's analogy, that a church must comply with Title VII "just as a church is required to comply with state tort laws when a parishioner is sexually abused by a minister employed by the church." This is a false analogy. The criminal and civil law applicable to sexual abuse of a parishioner does not regulate a church's selection, training, and supervision of its own ministers. Judge Fletcher cannot seriously be suggesting that the state tort laws are analogous to Title VII. If so, then on his own terms he would favor a "church doctrine" affirmative defense to sexual abuse suits. To save him from this position, I offer the only tenable distinction to be found: that employment laws like Title VII transgress the constitutionally protected employment relationship between a church and its ministers, while state tort laws do not.

IV

Judge Kozinski accuses me of "shoehorning" church doctrine and ministers' speech into the Establishment and Free Exercise clauses, as though this were a tight fit. The religion clauses were written as the first two protections of the Bill of Rights to protect freedom of religion. They are not idle chat-

---

ual harassment" in *Meritor Savings Bank, FSB v. Vinson*, on the theory that where "discrimination based on sex has created a hostile or abusive work environment," such a hostile environment "for members of one sex" is a "barrier to sexual equality at the workplace." 477 U.S. 56, 66-67 (1986) (internal quotation and citation omitted). If the Archbishop of Canterbury had killed one of the king's knights, or raped an altar boy, he would have faced trial under a murder or rape law of general applicability. That is not analogous to the case at bar because it has nothing to do with the church's employment decisions regarding its ministers. If the king had gotten rid of the archbishop by instigating a nun's claim that his prayers and interpretations of religious doctrine about sin had created a hostile environment for women, that would have been an employment discrimination claim analogous to the case at bar.

ter, mere mumbling before freedom of speech, the third protection.

The Free Exercise Clause is separate from the Freedom of Speech Clause, and has to be construed for that reason as adding additional protections, not as mere surplusage. Title VII regulation of ministers violates the Free Exercise Clause because people exercise their religious beliefs, both through their ministers who teach and guide their religious observance, and by creating and joining religious institutions of their choice.

Suppose a minister in his daily morning prayer were to thank God for making him a man and not a woman, as he would in at least one religious tradition. Even his silent prayer might create a hostile environment for a woman such as Elvig, whose complaint addressed a pastor's state of mind, when he allegedly "undressed her with his eyes." Or suppose a minister takes the view, as some do, that the Bible requires women to occupy a subordinate position in the family, and that only men should be permitted to preach. If he repeatedly, in his public prayers, asks God to bring about such a world, and repeatedly tells his female associate pastor that the Bible compels these views, she will no doubt sense that the environment is hostile to her work and denies her equality because of her sex. Yet the pastor (and his church) are entitled to the free exercise of religion by spreading this view, which he and perhaps his sect understand to be God's word. These opinions and prayers are political heresy. But in matters of religion, churches get to define heresy, not the government.

Pastors will have to be squelched, perhaps by requiring churches to subject them, as so many corporations do, to "workshops" where they will learn what not to say and what not to pray, on pain of church discipline.[38] If a male minister

---

[38]*Cf. Peterson*, 358 F.3d at 602 (Employee's posting of Biblical scriptures condemning homosexuality was perceived as violating the employer's anti-harassment policy).

thinks certain marital or sexual conduct is sinful and repeatedly says so, in the hearing of a female associate pastor who engages in such conduct and has said so, he too will have to relearn his Bible.

V

Title VII regulation of ministers also violates the Establishment Clause. If applied to ministers, it acts as a law "respecting an establishment of religion"[39] in that it infringes on churches' ability to train, ordain, hire, fire, and supervise their own ministers. Americans after our Revolution were unwilling to subject themselves to national government management of churches as had been maintained in England. The problem that the Establishment Clause addresses is not only government preference for a sect other than one's own, but also government interference with the autonomy of any religious establishment, one's own or another's. Because churches commonly have their own teachings on the matters Title VII governs, and because enforcement of Title VII requires government entanglement in church doctrine and discipline, such regulation is substantial and direct, not merely incidental. Churches, if substantially and directly regulated by Title VII, must become to a significant degree instrumentalities of the state, teaching its doctrines rather than theirs.

VI

Usually our Establishment Clause and Free Exercise Clause cases come from the opposite direction, where religious people are attempting to express themselves in public or in the workplace, sometimes under the mantle of the government. But this is no issue of symbolism, such as whether a creche is diluted enough not to be an endorsement because Santa Claus and a menorah are displayed along with it. Here we confront real government interference with how a church

---

[39]U.S. Const. amend. I.

manages its ministers. There is no problem with religious freedom if ministers have to keep their pants on in the presence of choir members, but there is impermissible government entanglement if ministers have to be careful how they talk about sex and sex roles and what parts of their sacred texts they cite, considering how extensively most traditional religions deal with sex differences and sexuality. This government interference with core ministerial conduct is why this case evokes thoughts of Henry II and Thomas Becket, and of Soviet control of Russian churches. The threat even of gentler interference, by Title VII compliance officers and lawsuits, is enough effectively to prohibit the free exercise of religion where it is in tension with contemporary views on equality of the sexes.

Our churches and their ministers are entitled to be free to propagate their religious views, under our Constitution. The religiosity of our population, compared with Europeans, facilitates the more libertarian government we enjoy. Our government can govern with a light hand partly because we the people are governed by our own strong sense of right and wrong. The religion clauses of the Constitution protect us from strife between sects, and between church and state. They also enable religious people to obtain the satisfaction of living virtuously in compliance with the tenets of their religions. Even those most hostile to one or another sect, or to all sects and to all religion, benefit from the religious freedom we enjoy, because competing power centers prevent the government from exercising a monopoly over the definition of vice and virtue. Our revolution, unlike the French, Mexican, and Russian revolutions, had no anti-clerical animus. Our First Amendment, far from restricting religion as those revolutions did, freed it both from government prohibition of free expression and from government management and preference for competing sects. We should have vindicated that religious freedom in this case.

GOULD, Circuit Judge, with whom BYBEE and BEA, Circuit Judges, join, dissenting from denial of rehearing en banc:

I would have heard this case en banc, and dissent from our denial of such rehearing. As I noted in my concurrence from the original *Elvig* panel decision, the result in this case seems to be compelled by *Bollard v. California Province of the Society of Jesus*, 196 F.3d 940 (9th Cir. 1999). There may be room for reasonable jurists to disagree on that, as did Judge Trott in his initial panel dissent, but I think *Bollard* controlling absent en banc review. At the same time, I continue to have reservations about whether *Bollard* was correctly decided.

In part my reservations about *Bollard* stem from constitutional concerns such as those that are raised by Judge Kleinfeld in his able dissent from denial of rehearing en banc. I am not yet certain I would agree with all that he would hold on the constitutional issues, but the issues that Judge Kleinfeld has voiced warrant a broader and a fresh hearing.

In part my reservations about *Bollard* stem from practical litigation concerns such as those that are raised by Judge Bea in his thoughtful dissent from denial of rehearing en banc, and that were earlier expressed by Judge Trott's articulate dissent to the initial panel decision. I do not see how a church can take advantage of the affirmative defense established by the Supreme Court's decisions in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 751-52 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998) without entangling the courts in the kind of review of church affairs that the establishment clause was designed to avoid. The practical concerns stated by Judge Bea too warrant a broader and a fresh hearing.

In part my reservations about *Bollard* stem from my dissatisfaction with *Bollard*'s prior holding that the extent of the so-called "ministerial exception" is defined solely by the scope of the First Amendment's constitutional protections guaran-

teeing free exercise of religion and prohibiting government's entanglement with religion. *Bollard*, 196 F.3d at 945. Instead, and before reaching the thorny constitutional questions that are set on the table by my colleagues Judges Trott, Kleinfeld and Bea, I would have thought that our en banc court might profitably have pondered whether Congress itself intended a broader sway for the ministerial exception to Title VII, given its statutory basis in 42 U.S.C. Sec. 2000e-1(a) (reciting that the subchapter shall not apply to a religious corporation or association or society with respect to employment of those of a particular religion to perform work connected with the religious entity's activities).

This statutory exception provides an uncertain scope, but I see no value to discarding it injudiciously in favor of a solely constitutional analysis. If there is ambiguity in the statutory exception's reach, it ought to be interpreted in a way to avoid a constitutional interpretation.

On these three lines of reasoning, I respectfully dissent.

---

BEA, Circuit Judge, with whom KLEINFELD, Circuit Judge, joins, dissenting from denial of rehearing en banc:

I heartily agree with Judge Trott that given the *Ellerth/Faragher*[1] affirmative defense, . . . *every step* the Church took to respond and react to Elvig's claims will be reviewed by the district court to determine where it was reasonable." *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 973 (9th Cir. 2004). From a practical point of view, such an inquiry would necessitate the court's adjudication of discovery issues, presentation of evidence, instructions to the jury, *etc.*

---

[1]*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751-52 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998).

This "review" might involve the following questions:

*Discovery*

(1)  Are Elvig's demands for production of records in previous claims of sexual harassment involving Pastor Ackles or other ministers "reasonable" in view of what may be the Church's doctrinal views that the damage of potential scandal to the community outweighs the benefit such records would have to the individual, Elvig? Was the Church's resolution of Elvig's demands reasonable?

*Composition of the Investigating Committee*

(2)  Is an Investigating Committee made up of three women and two men "reasonable" when claims are made of sexual harassment to a female?

(3)  If the men on the Committee were in a relatively higher position within the Church hierarchy to that of the women, is it "reasonable" to believe that each member of the Committee would exercise independent judgment?

*Instruction to the Jury*

(4)  Would the Investigating Committee's determination of whether the acts of Pastor Ackles constituted sexual harassment based on a "reasonable pastor" standard be "reasonable" in view of the civil legal system's rule that the proper standard for that determination is that of a "reasonable woman"? *See, e.g., Ellison v. Brady*, 924 F.2d 872, 878-79 (9th Cir. 1991) (holding that in the context of sexual harass-

> ment, objective hostility is evaluated from the
> perspective of a reasonable woman).

*. . . and on and on.* Challenges to the "reasonableness" of the Church's process and decision would be limited only by what limits there are to the ingenuity of counsel and the special pleading of activist organizations urging them on.

This review of what is reasonable would require consideration of what a reasonable employer would have done and would do to prevent the harassment under same or similar circumstances. Would such a review involve evidence of what processes are provided by other similarly situated employers? What evidence would be considered?

Should the jury hear the practices of employers of other Presbyterian ministers? Or should Episcopalian, Methodist and Unitarian practices be considered?

Should the jury consider the Catholic practices for Parish priests, or should practices for specific orders such as Jesuits, Franciscans, Augustinians, Dominicans[2] and Opus Dei also be considered?

In keeping with the secular instruction of the panel opinion, should non-ecclesiastic practices of secular moralist organizations be considered?

With these thoughts in mind, the excellent historical and jurisprudential development contained in Judge Trott's dissent commends itself to me.

---

[2]If memory serves, these were the original Inquisitors of the Holy Office.

*Ellerth/Faragher Burden-Shifting*

Ironically, because petitioner brings a claim under Title VII with its court-created affirmative defense and attendant burden-shifting, petitioner's claim here may well be barred. If plaintiff were to proceed solely on common-law claims, the result might be otherwise.

Under the law of the State of Washington, there is no employer liability for intentional acts of sexual harassment of a victim-employee by another employee, since sexual harassment is deemed to be outside the course and scope of the employee's duties to his principal. *See Robel v. Roundup Corp.*, 59 P.3d 611, 621, n.9 (Wash. 2002).

However, were the acts of sexual harassment by the employee done at the direction of the employer, perhaps for the purpose of driving the victim from the workplace, the intentional act of the employee-agent would be authorized, or perhaps ratified by the employer-principal if the unauthorized harasser were kept in employment, after the employer knew of the employee's harassing. Such proof would invoke well-settled principles of vicarious liability. *See Restatement (Second) Agency*, § 219 (authorized action); §§ 86, 89 (ratification).

Elvig retains her common law action against Pastor Ackles for intentional infliction of emotional distress as a result of the alleged sexual harassment, and against the Church if there is evidence of authorization or ratification.

However, if Elvig wishes to proceed under Title VII without proof of *authorization* or *ratification*, but on what the Church "should have known" and "should have done" to prevent sexual harassment, she must submit herself to the affirmative defense in *Ellerth/Faragher*.

That is because Title VII creates a new duty upon the employer (here, the Church): an affirmative duty to *prevent* intentional sexual harassment by a fellow employee, if it amounts to discrimination in the workplace, regardless the lack of evidence of authorization or ratification. However, with the imposition of the additional duty upon employers comes the *Ellerth/Faragher* affirmative defense. For the reasons earlier stated, determining what is a "reasonable employer" in-house process to prevent such discrimination ineluctably requires secular bodies to pass judgment on whether ecclesiastical entities are "reasonable" by standards of secular authorities.[3]

---

[3]In his concurrence in the order denying rehearing en banc, Judge W. Fletcher quotes *Bollard* for the proposition that "Nothing in the character of this [*Ellerth*] defense will require a jury to evaluate religious doctrine or the 'reasonableness' of the religious practices followed within the Jesuit order. Instead, the jury must make secular judgments about the nature and severity of the harassment and what measures, if any, were taken by the Jesuits to prevent or correct it." *See Elvig v. Calvin Presbyterian Church,* No. 02-35805, sl. op. at 1681 (W. Fletcher, J., concurring in order denying reh'g en banc)*; see also Elvig*, 375 F.3d at 963 ("[t]he reasonableness component of the *Ellerth/Faragher* affirmative defense evaluates an employer's *actions* in responding to sexual harassment rather than the motivations for that response." (emphasis in original)). In my view, this distinction is untenable. A jury's adjudication of the "reasonableness" of a religious institution's actions in response to a complaint of sexual harassment inevitably requires the jury to adjudicate the "reasonableness" of the religious doctrine that informs the measures taken by the religious institution. The religious institution's actions — or lack thereof — may be compelled by religious doctrine. For instance, a church may have an Employment Complaint Board where claims of sexual harassment can be reported, and dealt with, before they become so serious or frequent as to create a "hostile work environment." The Board may be composed, according to church hierarchical doctrine, of Bishops who are all male. Under the Panel Majority's Opinion, whether the composition of the panel were "reasonable" to prevent sexual harassment of female employees would be an issue which the secular trier of fact would decide.

*Application of Bollard*

I disagree with Judge Trott, however, that *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940 (9th Cir. 1999), can be distinguished on the grounds the petitioner in that case was a novitiate, not a full member, unless the vows Elvig took are to be given the same weight as an agreement to arbitrate outside the federal courts. *Elvig*, 375 F.3d at 957. I'm afraid that, to me, this is a thin reed. Agreements to arbitrate are always vulnerable to attack in civil courts for being substantively or procedurally unconscionable. *See, e.g.*, *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 690 (Cal. 2000); *Schroeder v. Fageol Motors, Inc.*, 544 P.2d 20, 23 (Wash. 1975). The arbitration decision is always vulnerable to attack in civil courts account the arbitrator's corruption. *See* 9 U.S.C. § 10; Cal. Civ. Code § 1286.2. If one is to separate Church and State, it cannot be on the ground that vows to abide by Church governance are tantamount to an agreement for alternative dispute resolution, for that resolution will always be vulnerable to attack in the civil courts, although perhaps not on the grounds the process and decision were "unreasonable." That Mr. Bollard had not engaged in an internal-to-the-Church resolution process is also not a ground for distinguishing his case. If he had, the same questions would arise which Elvig seeks to raise here, and which the Church could defend under *Ellerth/ Faragher*.

Even if *Bollard* is not distinguishable, it is wrongly decided, and it is time to revisit this important constitutional issue. For these reasons, and those aptly stated by Judge Kleinfeld with whose dissent I join, I respectfully dissent from our court's order denying rehearing en banc.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2005 Thomson/West.